**VALENCE OPERATING COMPANY, Petitioner,**

v.

**Elmagene W. DORSETT, Respondent.**

No. 03–0836.

Supreme Court of Texas.

Argued Sept. 29, 2004.

Decided May 20, 2005.

---

Michael E. Warwick, Abney & Warwick, Marshall, Thomas A. Zabel, Burns Wooley Marseglia & Zabel, L.L.P., Houston, for petitioner.

Edwin E. Buckner, Law Offices of Edwin E. Buckner, Jr., Marshall, for respondent.

Everard A. Marseglia Jr., Burns Wooley Marseglia & Zabel, L.L.P., Morgan L. Copeland Jr., Catherine B. Smith, Ara L. Ayles, Vinson & Elkins L.L.P., Gary C. Johnson, Senior Vice President & General Counsel, Houston, for amicus curiae.

Justice WAINWRIGHT delivered the opinion of the Court.

In this case we construe the meaning of certain notice provisions of a commonly used oil and gas operating agreement. Working interest owner Elmagene Dorsett sued Valence Operating Company in a dispute arising from a joint operating agreement. The trial court granted partial summary judgment against Dorsett on her breach of contract claims, finding that Dorsett failed to consent to participate in the wells at issue, and that a contractual non-consent penalty for that failure was enforceable against her. The court of appeals reversed and rendered judgment in favor of Dorsett, holding that Valence breached contract provisions that required Valence to give notice to Dorsett before commencing drilling operations. 111 S.W.3d 224. The determinative issue before us is whether the agreement requires a thirty-day notice period to expire before the operator can commence work on the proposed operations. Because the non-consent penalty is enforceable and because we find nothing in the agreement prohibiting Valence from commencing work on the proposed operations before the expiration of the notice period, we reverse the court of appeals and render judgment in favor of Valence.

## I. Factual and Procedural Background

Elmagene Dorsett is a 4.05391 percent working interest owner in 677.04666 acres in the Mobley Gas Unit in Harrison County, Texas. In 1981, Dorsett, with three other minority working interest owners, and TXO Production Corporation, as operator and majority working interest owner, executed a modified 1977 American Associ-

ation of Petroleum Landmen Form 610 Model Form Operating Agreement.[1] The Model Form Agreement is a contract between oil and gas lease owners and interest holders for the exploration and development of designated oil and gas within the geographical area described in the Agreement. A.A.P.L. Form 610–1977, preamble (1977). The Model Form Agreement designates a single party as "operator" who is responsible for the management and control of drilling, development, and production activities. *Id.* preamble, art. V., VI.A., C. All other parties are designated "non-operators." *Id.* preamble. The parties to the Agreement have the option on each project to share operating costs and liabilities, to own equipment, and, if exercised, to then benefit by sharing in production revenues in proportion to their respective percentages of ownership. In such cases, these participants are called "consenting parties." *Id.* art. I.G., VI.B. Parties who elect not to participate in a proposed operation, called "non-consenting parties," are subject to a "non-consent penalty" which operates as a temporary relinquishment of the interest owner's share of production revenue from the project to the consenting parties.[2] *Id.* art. I.H., VI.B. After the consenting parties recoup their investment costs and receive a limited return on their investments, the non-consenting parties share in production revenues in proportion to their ownership interests. *Id.*

The relevant portion of the Model Form Agreement is Article VI.B. on Subsequent Operations:

1. *Proposed Operations:* Should any party hereto desire to drill any well on the Contract Area . . ., the party desiring to drill . . . shall give the other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective formation and the estimated cost of the operation. The parties receiving such a notice shall have thirty (30) days after receipt of the notice within which to notify the parties wishing to do the work whether they elect to participate in the cost of the proposed operation. . . . Failure of a party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. Any notice or response given by telephone shall be promptly confirmed in writing.

2. *Operations by Less than All Parties:* If any party receiving such notice as provided in Article VI.B.1. or VI.E.1. elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, within sixty (60) days after the expiration of the notice period of thirty (30) days . . . actually commence work on the proposed operation and complete it with due diligence. . . .

. . . .

. . . Upon commencement of operations for the drilling, completing, reworking, deepening or plugging back of any such well by Consenting Parties in accordance with the provisions of this Article, each Non–Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting

---

1. The parties modified several provisions of the Model Form Agreement, but none of the changes affect the outcome of this case.

2. We do not agree that this non-consent penalty is, as its name suggests, a forfeiture or punitive provision, but we will use the industry's nomenclature.

Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non–Consenting Party's interest in the well and share of production therefrom until the proceeds of the sale of such share, calculated at the well, or market value thereof if such share is not sold (after deducting production taxes, royalty, overriding royalty and other interests existing on the effective date hereof, payable out of or measured by the production from such well accruing with respect to such interest until it reverts) shall equal the total of the following:

(a) 100% of each such Non–Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such Non–Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non–Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non–Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to each Non–Consenting Party had it participated in the well from the beginning of the operation; and

(b) 300% of that portion of the costs and expenses of drilling reworking, deepening, or plugging back, testing and completing, after deducting any cash contributions received under Article VIII.C., and 300% of that portion of the cost of newly acquired equipment in the well (to and including the wellhead connections), which would have been chargeable to such Non–Consenting Party if it had participated therein.

. . . .

If and when the Consenting Parties recover from a Non–Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non–Consenting Party shall automatically revert to it, and, from and after such reversion, such Non–Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production therefrom as such Non–Consenting Party would have been entitled to had it participated in the drilling, completing reworking, deepening or plugging back of said well. Thereafter, such Non–Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement and the Accounting Procedure, attached hereto.

A.A.P.L. Form 610–1977, art. VI.B. (1977).

In 1981, TXO drilled the initial test well, Mobley Well No. 1. In 1994, Valence acquired ownership of 94.28446 percent of the working interest in the unit from Marathon Oil Company (successor to TXO) and became unit operator. From 1996 to 2001, Valence drilled eight more gas wells in the unit. Valence provided Dorsett with written notice of its intent to drill each of the eight wells, as required by the Model Form Agreement, but in each case began preparatory work, and in some cases drilling, before thirty days had elapsed after Dorsett's receipt of the notice. Dorsett received the notices but did not consent to and did not contribute to any of the costs incurred in drilling the wells. Valence then imposed on Dorsett the non-consent penalty described in the Model Form Agreement.

Dorsett disputed the imposition of the non-consent penalty. Specifically, Dorsett contended that the Model Form Agree-

ment required Valence to allow the thirty-day notice period to elapse before commencing work on proposed operations. She argued that Valence's failure to do so constituted a breach of contract, thereby preventing enforcement of the non-consent penalty. She also contended that the non-consent penalty was an unenforceable liquidated damages provision. In 2000, Dorsett sued Valence for breach of contract, specific performance, and conversion. She asserted causes of action for damage to the surface of her land stemming from Valence's failure to accommodate surface use and negligence; she also requested a declaratory judgment of her rights under the Agreement and a full accounting.

The parties filed cross-motions for partial summary judgment. Dorsett moved for partial summary judgment on the breach of contract, accounting, and declaratory judgment claims and requested severance of her surface damage claims. Valence moved for partial summary judgment on the contract claims as well. The trial court granted Valence's motion for partial summary judgment on the breach of contract claims, finding that Dorsett failed to elect to participate in the eight wells and that the non-consent penalty was enforceable against her. The trial court then severed the contract claims. The court of appeals reversed and rendered judgment in favor of Dorsett, holding that Valence failed to comply with the Model Form Agreement provisions for notice of proposed operations, thus making the non-consent penalty inapplicable to Dorsett. 111 S.W.3d at 235.

## II. Standard of Review

 We review the trial court's summary judgment de novo. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex.2003). When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Knott*, 128 S.W.3d at 215; *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex.1997). When both parties move for partial summary judgment on the same issues and the trial court grants one motion and denies the other, as here, the reviewing court considers the summary judgment evidence presented by both sides, determines all questions presented, and if the reviewing court determines that the trial court erred, renders the judgment the trial court should have rendered. *See FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex.2000).

## III. Notice Period

Dorsett argues that because Valence did not satisfy the Agreement's notice requirements, her share of new production could not be reduced pursuant to the penalty. Dorsett interprets the Model Form Agreement to require Valence to deliver notice at least thirty days before the commencement of proposed operations. Valence argues that the Agreement requires notice of proposed subsequent operations to be given to working interest owners, who then have thirty days to elect to participate in the drilling of the well. Under Valence's construction, the operator may commence work on the proposed operations during the thirty-day notice period or even before the thirty-day notice period begins. To support this interpretation, Valence argues that the phrase stating that the operator "shall, within sixty (60) days after the expiration of the notice period of thirty (30) days ... actually commence work on the proposed operation and complete it with due diligence" illustrates that the provision's purpose is not to prohibit the early commencement of work, but to ensure that work is not unreasonably delayed after the

consent deadline. A.A.P.L. Form 610–1977, art. VI.B.2. (1977).

■■■ In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex.2003); *Gulf Ins. Co. v. Burns Motors, Inc.*, 22 S.W.3d 417, 423 (Tex. 2000); *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983). To achieve this objective, courts should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. *J.M. Davidson, Inc.*, 128 S.W.3d at 229; *Coker*, 650 S.W.2d at 393. Contract terms are given their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex.1996); *W. Reserve Life Ins. Co. v. Meadows*, 152 Tex. 559, 261 S.W.2d 554, 557 (1953); *see also Knott*, 128 S.W.3d at 219.

■■ The notice provision of the Model Form Agreement provides:

[T]he party desiring to drill, complete, rework, deepen or plug back such a well shall give the other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective formation and the estimated cost of the operation. The parties receiving such a notice shall have thirty (30) days after receipt of the notice within which to notify the parties wishing to do the work whether they elect to participate in the cost of the proposed operation.... Failure of a party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation....

. . . .

... [I]n order to be entitled to [impose the non-consent penalty], the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, within sixty (60) days after the expiration of the notice period of thirty (30) days ... actually commence work on the proposed operation and complete it with due diligence.

A.A.P.L. Form 610–1977, art. VI.B.1.–2. (1977).

We agree with Valence that this provision places no temporal limitation on Valence's ability to commence work on the proposed projects. The Agreement clearly states that "[t]he parties receiving such a notice shall have thirty (30) days after receipt of the notice within which to notify the parties wishing to do the work whether they elect to participate in the cost of the proposed operation." *Id.* art. VI.1. This plain language in the Agreement describes Dorsett's right to receive notice of proposed operations and to elect to participate in those operations. It places no restrictions on when Valence may commence drilling or preparations for drilling. Dorsett does not dispute that she received notice of all of the proposed operations, nor does she contend that she elected to participate in the drilling of Mobley Wells 2 through 9. Her undisputed failure to consent to the proposed operations within thirty days was a "[f]ailure ... to reply within the period above fixed" and "constitute[d] an election by that party not to participate in the cost of the proposed operation," thus making the non-consent penalty applicable to Dorsett. *Id.*

In short, the thirty-day notice period sets a deadline for Dorsett to decide whether to participate in proposed operations. Nothing in the language of the Agreement forbids the operator from com-

mencing work before the end of the notice period. However, there is a temporal limit in the Agreement on Valence that sets a deadline, not a required start date, on Valence's commencement of work. The Agreement requires the operator to commence work no later than sixty days after the expiration of the thirty-day notice period. A.A.P.L. Form 610–1977, art. VI.B.2. (1977). The distinction between the two notice periods in the Agreement retains the working interest owner's right to thirty days notice before being required to make a decision, while also requiring the operator to commence work no later than ninety days after formally proposing the operation to the interest owners.[3]

This interpretation effectuates the written agreement of the parties. We recognize that this interpretation allows an operator to commence a new operation before the thirty-day notice period has expired; however, potential benefits may accrue to the owners for an operator's "early" commencement. For example, an early start may avoid detrimental occurrences such as the draining of an oil field by a neighboring operator or the expiration of an oil and gas lease. Moreover, the risk of early commencement of such operations falls entirely on the operator because if none of the working interest owners consent to participation within thirty days, the operator bears the full cost of operations. The parties do not identify any negative consequences to the working interest owners that arise from commencement of operations within the thirty-day notice period.

## IV. Non–Consent Penalty

Dorsett received notice of each of the proposed subsequent operations. She ac-knowledges that she did not consent to any of the proposed operations within thirty days of receiving notice. She therefore is a non-consenting party under Article VI. B.1. of the Model Form Agreement, and the non-consent penalty applies to her.

The relevant portion of the Model Form Agreement provides:

"Upon commencement of operations for the drilling, completing, reworking, deepening or plugging back of any such well by Consenting Parties in accordance with the provisions of this Article, each Non–Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non–Consenting Party's interest in the well and share of production therefrom until the proceeds of the sale of such share, calculated at the well, or market value thereof if such share is not sold ... shall equal the total of the following:

(a) 100% of each such Non–Consenting Party's share of the cost of any newly acquired surface equipment ... plus 100% of each such Non–Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non–Consenting Party's relinquished interest shall revert to it under other provisions of this Article ...; and

(b) 300% of that portion of the costs and expenses of drilling reworking, deepening, or plugging back, testing and completing, after deducting any cash contributions received under Article VIII.C., and 300% of that portion of the

**3.** The resolution of this case does not require us to determine whether the phrase "actually commence work," as used in the Model Form Agreement, requires the commencement of drilling or the commencement of other preparatory work no later than ninety days after formally proposing the operation. Therefore, we express no opinion on this issue.

cost of newly acquired equipment in the well ..., which would have been chargeable to such Non–Consenting Party if it had participated therein."

A.A.P.L. Form 610–1977, art. VI.B.2. (1977). This clause allows consenting parties to recoup up to 100 percent of the non-consenting party's share of the costs of any new surface equipment and operation of the well and up to 300 percent of the non-consenting party's share of the costs and expenses of drilling and new equipment in the well, subject to deductions. After the consenting parties have recouped these costs, then the non-consenting party returns to sharing in production revenues in proportion to his or her ownership interest. *Id.; see also Nearburg v. Yates Petroleum Corp.,* 123 N.M. 526, 943 P.2d 560, 565 (App.1997) (explaining operation of the Model Form Agreement's non-consent penalty provision).

■■■ Whether a contract term is a liquidated damages provision is a question of law for the court to decide. *Phillips v. Phillips,* 820 S.W.2d 785, 788 (Tex.1991) (citing *Farrar v. Beeman,* 63 Tex. 175, 181 (1885)). Dorsett contends that the non-consent penalty is an unenforceable liquidated damages provision. We disagree. This clause is different from a liquidated damages clause. Liquidated damages clauses fix in advance the compensation to a party accruing from the failure to perform specified contractual obligations, whereas non-consent penalties reward consenting parties for undertaking a defined risk. *See Nearburg,* 943 P.2d at 567 ("[T]he non-consent penalty is the agreed-upon reward to [a consenting party] for taking the risk.... As a contractual arrangement, the carried interest is subject to negotiation and modification, and the parties' rights and obligations depend upon their contract."); Restatement (Second) of Contracts § 356 (1981) ("Damages for breach by either party may be liquidated in the agreement but only at an amount that is reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss."). The non-consent penalty provision in this oil and gas operating agreement is the mechanism utilized to allow the consenting parties the opportunity to recover their investments and receive defined returns from future operations. For such operations, they undertake a financial risk that the non-consenting parties do not. Here, the non-consenting party is not being punished for breaching a contract; she simply agreed not to participate in a return on an investment she did not make. Indeed, after the provision's requirements are met, she receives additional revenues from new wells for which she paid nothing. One Texas court of appeals, in its consideration of whether a non-consent penalty was enforceable, characterized the penalty as a liquidated damages clause and decided that it was enforceable against the non-consenting working interest owner. *Hamilton v. Tex. Oil & Gas Corp.,* 648 S.W.2d 316, 321 (Tex.App.El Paso 1982, writ ref'd n.r.e.). While *Hamilton* reached the correct result, we disapprove of its treatment of the non-consent penalty as a liquidated damages provision.

■■■ There is a second reason why Dorsett's assertion is unpersuasive. Assuming, *arguendo,* that Dorsett was correct in claiming that the non-consent penalty is a liquidated damages clause, her argument still fails because, traditionally, liquidated damages are recoverable only where there has been a failure to perform contractual obligations. *Phillips,* 820 S.W.2d at 788; *Rio Grande Valley Sugar Growers, Inc. v. Campesi,* 592 S.W.2d 340, 342 n. 2 (Tex.1979). As the court in *Nearburg* noted, "a non-consent election cannot convincingly be characterized as a

breach.... Therefore, we do not regard the non-consent penalty provision as involving liquidated damages or an unenforceable penalty." *Nearburg*, 943 P.2d at 566. We have held that Valence complied with the terms of the Agreement by properly sending notices to Dorsett. Dorsett failed to consent to the proposed operations. Neither party breached the contract.

To interpret the provision as Dorsett suggests would not only contradict its plain language, but would vanquish the incentive for parties to consent and incur costs and liabilities for new projects. If all working interest owners shared equally in production revenues from subsequent projects, whether they consented or not, none would consent because there would be no incentive to do so. In fact, the incentives would strongly favor not consenting because, under Dorsett's approach, a non-consenting party would be able to reap the rewards of new operations without incurring any expense. The non-consent penalty is designed to allow reasonable compensation for working interest owners who undertake the risk of developing new wells. *See Phillips*, 820 S.W.2d at 788. Other terms sometimes used to describe the non-consent penalty—"sole risk clause" and "risk charges"—more accurately convey this rationale. *See* 111 S.W.3d at 226 n. 1.

### V. Conclusion

We conclude that Valence provided timely notice to Dorsett of its proposed subsequent operations; consequently, Valence did not breach the Agreement. The non-consent penalty is not an unenforceable liquidated damages provision and is

enforceable against Dorsett. Therefore, we reverse the court of appeals' judgment and render judgment that Dorsett take nothing.

Justice BRISTER delivered a concurring opinion.

Justice JOHNSON did not participate in the decision.

Justice BRISTER, concurring.

Casual readers may not understand how a court could possibly hold that a "non-consent penalty" is not a "penalty." Although fully joining the Court's opinion and judgment, I write briefly to explain.

The Court discloses in a footnote that "non-consent penalty" is industry vernacular. 164 S.W.3d at 659 n. 2. The term does not appear in the Operating Agreement, and interpretation of that contract is a question of law for the Court. *Lee Lewis Const., Inc. v. Harrison*, 70 S.W.3d 778, 783 (Tex.2001). What the parties call a clause is parol evidence, and thus inadmissible unless a contract is ambiguous. *Friendswood Development Co. v. McDade + Co.*, 926 S.W.2d 280, 283 (Tex.1996) (per curiam). This one is not.

Generally, a liquidated damages provision providing for a multiple of actual damages is an unenforceable penalty. *Phillips v. Phillips*, 820 S.W.2d 785, 789 (Tex.1991). But while the clause here is certainly liquidated,[1] it is not a liquidated-damages clause.[2]

The parties' contract provides unambiguously that Dorsett is not required to contribute to subsequent operations. Thus, there is no breach of contract if she opts out.

---

**1.** *See* Black's Law Dictionary 494 (8th ed.2004) ("liquidated, adj. 1. (Of an amount or debt) settled or determined, esp. by agreement.").

**2.** *See id.* ("liquidated-damages clause. A contractual provision that determines in advance the measure of damages if a party breaches the agreement.").

The contract also provides unambiguously that those who do not consent nevertheless get additional revenues (after recoupment by those who do), for which they pay nothing. This is not a penalty but a bonus.[3]

The contract also provides unambiguously that those who do consent get 300% recoupment of certain costs, for which nonconsenting parties again pay nothing. These are not damages.[4]

I recognize that in some situations receiving less is the economic equivalent of paying more. But bonuses for a star athlete or salesman are not intended to penalize their employers, but to increase returns for all concerned. Unless an oilfield can be completely emptied from existing wells, further development is not a zero-sum game.

Those in the oil industry widely use and rely on clauses like the one here, and certainly consider them enforceable. *See* John R. Reeves & J. Matthew Thompson, *The Development of the Model Form Operating Agreement: An Interpretive Accounting*, 54 Okla. L.R. 211, 254–55 (2001). Dorsett provides precedent in neither law nor logic suggesting that liquidated bonus clauses should be unenforceable, nor why she should get a bonus for a risk she never took. Accordingly, this is not a "non-consent penalty."

---

**3.** *See id.* at 134 (''bonus. 1. A premium paid in addition to what is due or expected <year-end bonus%.'').

**4.** *See id.* at 416 ("damages, n. pl. Money claimed by, or ordered to be paid to, a person as compensation for loss or injury <the plaintiff seeks $8,000 in damages from the defendant%.'').