NO. 07-06-0168-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL A

OCTOBER 30, 2007

_____

WEST TEXAS GAS, INC., APPELLANT

V.

CARTHEL BROTHERS, 4M BROTHERS, J. O. DAWDY,

LARRY J. ADRIAN and RONALD D. GRAHAM, APPELLEES

_____

FROM THE 110TH DISTRICT COURT OF FLOYD COUNTY, TEXAS;

NO. 9444; HONORABLE JOHN R. HOLLUMS, JUDGE

_____

Before CAMPBELL and HANCOCK and PIRTLE, JJ.

**MEMORANDUM OPINION**

Appellant, West Texas Gas, Inc. (WTG), appeals from a summary judgment entered in favor of Appellees, Carthel Brothers, 4M Brothers, J. O. Dawdy, Larry J. Adrian, and Ronald D. Graham, on their breach of contract and Texas Deceptive Trade Practices Act claims. WTG contends that it did not overcharge Appellees for natural gas purchased by

Appellees to be used as irrigation fuel. The parties filed competing motions for summary judgment below. Appellees' motion was granted and WTG's motion was denied. On appeal, WTG contends the trial court erred in granting Appellees' motion for summary judgment and in denying WTG's motion for summary judgment because (1) WTG did not breach its contract with Appellees, and (2) WTG did not violate the DTPA. By its third issue, WTG asserts the trial court erred in granting Appellees' motion for summary judgment because it incorrectly ruled on WTG's affirmative defenses. We reverse and render in part and remand in part.

## Background

WTG sells natural gas to irrigation customers in West Texas, the Texas Panhandle, and other areas. On various dates ranging from December 12, 1989 through March 16, 1995, WTG and each Appellee entered into standard form Agricultural Gas Service Agreements.

The service agreements obligated each Appellee to purchase from WTG their entire natural gas requirements for fuel for agricultural activities so long as the service agreements were in effect. Although they had one-year terms, the service agreements were automatically renewed from year to year absent a written election to terminate 30-60 days before the end of the one-year period.

Paragraph two of the service agreements granted WTG the right to set the rates charged for gas sold to Appellees from time to time:

> Customer agrees to pay for all gas which passes through customer's meter . . . in accordance with standard rates established. The rate to be charged will be WTG Rate of [063 or 036] (of which a copy is available upon request) or subsequent rates, as may be determined by WTG, from time to time . . .

Paragraph eleven of the service agreements stated that "[n]o agent, representative or employee of WTG has authority to make any promise, agreement or representation not incorporated herein, and any such promise, agreement or representation not so incorporated shall not bind WTG."

During subsequent years, typically in February or March, WTG would send its agricultural and irrigation customers, including Appellees, letters containing a rate schedule for the upcoming growing season with some indication as to whether WTG believed the rate schedule would remain unchanged throughout the calendar year. For instance, in January 1992, WTG sent a letter announcing an overall reduction in their rate schedule but cautioned that an interruption in supplies from their lower cost gas suppliers might necessitate a price change during the season. And, in September 1992, WTG sent a letter announcing a price increase late in the 1992 growing season due to volatile trading in natural gas futures influenced significantly by the damage inflicted by Hurricane Andrew.

Between 1993 and 1996, WTG's letters contained statements that the year's rate schedule "will remain unchanged" or was "expected to remain effective" throughout the

3

calendar year. However, from 1997 to 1999, WTG's letters were more tentative. Although the letters stated that WTG's rate schedule for the year's growing season "should" or "was intended" to remain firm, the letters qualified these statements with provisoes.[1]

In February 2000, WTG sent a letter to its customers offering various rate alternatives for the 2000 growing season. Customers were given an option of choosing between three different rate programs: Fixed Price, Index Price, and Ceiling Price. The "Fixed Price" program was described as follows:

"Fixed Price"　　　　Effective for billings issued after March 1, 2000, WTG's firm monthly rate schedule for the remainder of calendar year 2000 will be –

First 50 Mcf　　　　$3.55 per Mcf

Next 450 Mcf　　　　$3.15 per Mcf

Over 500 Mcf　　　　$2.80 per Mcf

WTG's letter also enclosed a gas sales agreement for making pricing elections which provided as follows:

---

[1]For instance, the 1997 letter stated that "WTG intends to maintain this firm rate schedule for the remainder of the 1997 calendar year, provided there is not a significant increase in the delivery charges that WTG pays . . . ." The 1998 letter stated, "[t]he new rate schedule should remain firm for the remainder of the 1998 calendar year, provided there is not a significant increase in the delivery charges . . . ." WTG's 1999 letter stated that "WTG intends to maintain this firm rate schedule throughout the 1999 growing season, however should there be a significant increase in the delivery charges that WTG pays to Westar Transmission Company, WTG will provide its customers with a thirty (30) day notice of any changes in our schedule reflected above."

4

We have enclosed a gas sales agreement where you may indicate your pricing election for the 2000 irrigation season. *Customers who do not return an executed gas sales agreement to their local WTG office by March 20, 2000 will be charged according to the "Fixed Price" shown above.*

(Emphasis supplied).

The enclosed Irrigation and Agricultural Sales Agreement permitted customers to elect Fixed Price, Index Price, or Ceiling Price, by placing a check in the box next to the rate program. The Sales Agreement stated that "[e]xecution of this Agreement shall terminate and supersede any prior agreements between the parties," and was "binding upon execution by all parties."

Paragraph four (4) of the Sales Agreement further stated:

This Agreement is contingent on availability of natural gas suppliers and third party transportation services. WTG has the unconditional right to suspend, discontinue, or decrease, in whole or in part, the delivery of gas hereunder due to partial or complete curtailment of gas supplies or third-party transportation services necessary to deliver gas to Buyer.

Neither WTG nor Appellees elected to terminate the existing service agreements prior to the 2000 growing season. Appellees did not respond to WTG's February 2000 letter.

In May 2000, WTG sent another letter to its customers indicating that gas commodity prices had experienced a dramatic increase in excess of fifty percent (50%). The letter further indicated that industry experts believed that rising gas usage in electrical

5

generation, lower than anticipated gas volumes in storage, and warmer than normal temperatures caused this extreme price increase. As a result, the letter stated that WTG was increasing its "Fixed Price" rate schedule, and included a revised "Fixed Price" rate schedule to be made effective July 2000 until further notice. Thereafter, Appellees were charged according to the revised rate schedule for the remainder of the 2000 growing season.

In May 2005, Appellees filed suit against WTG alleging that the rate increase breached their contracts with WTG and violated the DTPA. In addition to damages for breach of contract, Appellees sought, among other relief, up to two times their economic damages under the DTPA, declaratory judgment, and attorney's fees.

Appellees and WTG filed competing motions for summary judgment. And, without specifying any grounds, the trial court granted summary judgment in favor of Appellees and denied WTG's requested relief.

**Standard of Review**

We review the trial court's summary judgment *de novo*. *Valence Operating Company v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). We take as true all evidence favorable to the nonmovant while indulging every reasonable inference and resolve any doubts in the nonmovant's favor. *Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006).

6

When both parties move for summary judgment on the same issues and the trial court grants one motion and denies the other, as here, the reviewing court considers the summary judgment evidence presented by both sides, determines all questions presented, and if the reviewing court determines that the trial court erred, renders judgment the trial court should have rendered. *Valence Operating Company*, 164 S.W.3d at 661. *See Bank of America, N.A. v. Amarillo National Bank*, 156 S.W.3d 108, 110 (Tex.App.--Amarillo 2004, no pet.). In doing so, each party bears the burden of establishing the relief claimed as a matter of law, *City of Garland v. Dallas Morning News,* 22 S.W.3d 351, 356 (Tex. 2000), and the reviewing court should remand any claims where the summary judgment burden has not been met. *Al's Formal Wear of Houston, Inc. v. Sun,* 869 S.W.2d 442, 444 (Tex.App.–Houston [1st Dist.] 1993, writ denied). Moreover, where, as here, the trial court's order granting summary judgment does not specify the basis for the ruling, we must affirm summary judgment if any of the summary judgment grounds are meritorious. *Western Investments, Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005). *See Texas Workers' Compensation Commission v. Patient Advocates of Texas*, 136 S.W.3d 643, 648 (Tex. 2004).

## Discussion

The trial court erred in its determination that Appellees' inaction created new contracts obligating WTG to charge Appellees under a firm monthly rate schedule for the remainder of 2000. To lock in the firm monthly rate schedule for the entire year, WTG's

7

February 2000 letter required that Appellees execute the attached Sales Agreement and return it to their local WTG office by March 20, 2000. Because Appellees failed to comply, Appellees' rights regarding rate changes remained governed by their existing service agreements.

Under the service agreements, WTG could re-determine rates from time to time during the calendar year. Thus, when WTG re-determined their rate schedule in May 2000, the re-determination did not constitute a breach of a "new" contract because none existed. Moreover, because WTG exercised its legal rights under the Service Agreement when it increased the rate schedule, Appellees' DTPA action fails as a matter of law. Accordingly, we reverse the trial court's order granting Appellees' motion for summary judgment and its order denying WTG's motion for summary judgment, and we grant judgment in favor of WTG on its motion for summary judgment and deny Appellees' motion for summary judgment.

## I. Breach of Contract Claim

When the interpretation of a contract is in issue, the court must first determine whether the provisions in question are ambiguous, 14 Tex.Jur.3d *Contracts* § 222 (2006), which is a question of law that must be decided by examining the contract as a whole in light of the circumstances present when the contract was entered. *Enterprise Leasing Company of Houston v. Barrios*, 156 S.W.3d 547, 662 (Tex. 2004). If the contract's language is susceptible to a certain or definite legal meaning or interpretation, then the

contract is unambiguous and the court will construe the contract as a matter of law. *Id.* Contract terms are given their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense, *Valence Operating Company v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005), and an ambiguity exists only if the contract language is susceptible to two or more interpretations. *American Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003). Ambiguity does not arise simply because the parties offer conflicting interpretations. *Id*.

WTG's February 2000 letter offered its customers the option of choosing between three different rate programs. The letter states "[w]e have enclosed a gas sales agreement where you may indicate your pricing election for the 2000 irrigation season." The attached Sales Agreement contains a check box for each of the three rate programs and states "[t]his Agreement is binding upon execution by all parties." By its express terms, WTG's offer of a firm monthly rate schedule for 2000 could only be accepted by executing the attached gas sales agreement. Appellees did not comply with the express terms of WTG's offer. Thus, no new contract was created and Appellees' rights remained governed by their existing service agreements. *See* 14 Tex.Jur.3d Contracts § 81 (2006) ("No contract can result from an offer or proposal until the other party accepts it in strict accordance with its terms.").

Appellees are mistaken in their contention that WTG's offer could be accepted by doing nothing. Largely ignoring the remaining provisions of the letter and the Sales

9

Agreement, Appellees rely on a single sentence for their method of election: *"Customers who do not return an executed gas sales agreement to their local WTG office by March 20, 2000 will be charged **according to** the "Fixed Price" shown above."* This sentence, however, does not say that Appellees *will be charged the "Fixed Price"* for a definite term if they do nothing. The sentence merely states they will be charged **according to** the "Fixed Price" if they do nothing. As such, this sentence does no more than inform WTG's customers that, if they do not elect a new rate program by executing a new sales agreement, they will be charged as they have in the past, *i.e.* pursuant to a rate schedule which was subject to adjustment under the terms of their existing service agreement. Absent the parties election to accept WTG's offer and execute a new sales agreement, the February 2000 letter was like any other received by Appellees before the growing season, it merely informed Appellees of the rate schedule WTG *intended* to charge over the coming months.

Alternatively, even if the letter contained an offer of a firm monthly rate schedule for the remainder of 2000 capable of being accepted by inaction, the term could not become a part of the Appellees' existing contracts because the service agreements expressly require that such a promise be incorporated in the Agreement before WTG would be bound thereby. There is no evidence in the record indicating that any language in the February 2000 letter was incorporated into Appellees' service agreements.[2] Accordingly,

---

[2]Appellees did not assert below, and the Court does not consider, whether a modification of the Service Agreement was possible under the circumstances. However, given the language of Appellees' service agreements, we doubt a modification would be

10

WTG's first issue is sustained and WTG is entitled to a take nothing judgment on Appellee's breach of contract claims.

## II. DTPA Claim

Appellees assert that WTG violated the DTPA by (1) making the representation in its February 2000 letter that the firm monthly rate schedule for the remainder of 2000 would remain the same and subsequently raising the price in May 2000, and (2) taking unfair advantage of Appellees by unilaterally raising its gas price in May 2000 at a time when WTG was the exclusive supplier of their natural gas and it was too late for Appellees to make alternative arrangements. The gist of Appellees' DTPA claims is that WTG represented in its February 2000 letter that it wouldn't raise the rate schedule for the remainder of the 2000 calendar year, and then it committed an unconscionable act by unilaterally raising the rate schedule in May 2000.

In *Crawford v. Ace Sign, Inc.*, 917 S.W.2d 12, 13-14 (Tex.1996), the Supreme Court addressed the tenuous relationship between contract law and the DTPA and concluded that an allegation of mere breach of contract, without more, does not allege a violation of the DTPA. As previously discussed, the representations of WTG pertaining to the time the "fixed rate" schedule would remain unchanged, as contained in its February 2000 letter, were merely representations of the terms of a contractual offer which the Appellees did not

_____

possible unless it were incorporated into the Service Agreement in accordance with its terms.

11

accept. Appellees' DTPA claims are inextricably intertwined in their contract claims and do not exist independent of those claims. By its own terms, WTG's letter was an offer of various rate alternatives. If the offer had been accepted as specified, WTG's offer would have become a contractual duty. Thereafter, if WTG failed to apply the rate schedule as promised, the appropriate action would be for breach of contract and not the DTPA. *Id.*

Because Appellees failed to accept the offer in the manner specified by the letter, a new contract was not formed and WTG owed them no contractual duty to apply the firm monthly rate schedule for the remainder of 2000. In May 2000, Appellees rates were re-determined in accordance with the original service agreement between Appellees and WTG. By exercising its legal rights under the existing contract and adjusting the price, WTG did not engage in unconscionable conduct, or take unfair advantage of Appellees. *See DeWitt County Elec. Co-op., Inc. v. Parks,* 1 S.W.3d 96, 103 (Tex. 1999) (holding that a DTPA claim could not arise from actions permissible under a contract). Neither did WTG's valid exercise of its legal right to adjust the rate schedule constitute an actionable misrepresentation under the DTPA. WTG's second issue is sustained and WTG is entitled to a take nothing judgment on Appellees' DTPA claims.

### III. Affirmative Defenses

Finally, we pretermit consideration of WTG's third contention that the trial court erred in granting Appellees' motion for summary judgment based upon an incorrect

12

disposition of WTG's affirmative defenses.  While we are mindful of this contention, our disposition of issues one and two eliminates the necessity that we consider this issue.[3]

## Conclusion

For the reasons stated above, the trial court's judgment granting Appellees' motion for summary judgment and denying WTG's motion for summary judgment is reversed and judgment is hereby rendered denying Appellees' motion for summary judgment and granting WTG's motion for summary judgment that Appellees take nothing on their claims.[4] Furthermore, all costs are assessed against Appellees and the cause is remanded to the trial court for determination of the merits of WTG's claim for further relief under the provisions of Tex. Civ. Prac. & Rem. Code § 37.009.

Patrick A. Pirtle
Justice

---

[3]Tex. R. App. P. 47.1.

[4]In reversing the trial court's order denying WTG's motion for summary judgment and in rendering judgment in favor of WTG, we are mindful of the fact that WTG's Notice of Appeal references only "the trial court's *judgment* rendered on April 4, 2006, in its Order Granting Plaintiff's Motion for Summary Judgment Nunc Pro Tunc (emphasis added)." The referenced order does contain a "Mother Hubbard" clause indicating an intent to dispose of all relief not expressly granted therein, thereby implicitly incorporating the March 21, 2006, Order Denying Defendant's Motion for Summary Judgment.  Furthermore, the final *judgment* of the court can consist of a series of orders that, when taken together, disposes of all claims and parties. *See Mafrige v. Ross,* 866 S.W.2d 590, 591 (Tex.1993), *overruled in part on other grounds*, *Lehmann v. Har-Con Corp.,* 39 S.W.3d 191 (Tex. 2001).