Opinion issued June 25, 2009









Opinion issued June 25,
2009

 

 

 

 

 

                                                                        

 

 

 

 

 

 

 

 

In The

Court of Appeals

For The

First District of Texas

 




 
 
 
 
 
 
 


 



NOS.          01-08-00046-CV

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



DBHL, INC. and DEARBORN HL, S. de R.L. de C.V.,
Appellants

 

V.

 

MOEN INCORPORATED and MOEN SONORA S.A. de C.V.,
Appellees

 

 



On Appeal from the 295th District Court

Harris County, Texas

Trial Court Cause No. 2004-71621

 

 

 



O P I N I O N

After DBHL, Inc. and
Dearborn HL, S. de R.L. de C.V. (DBHL) settled numerous product liability
claims for damages resulting from a defective plumbing part, it sued Moen
Incorporated and Moen Sonora S.A. de C.V. (Moen) for indemnification based on a
Texas statute and a provision of an asset purchase agreement (APA) under which
DBHL acquired a prototype of a defective part.  Moen counterclaimed for
indemnity for attorney’s fees that it expended in connection with the
underlying claims.  The trial court granted summary judgment against DBHL on
its statutory indemnification claim, and, after a bench trial, entered a
take-nothing judgment against both DBHL and Moen on the remaining
indemnification claims.  DBHL appeals, contending that the evidence is not
legally or factually sufficient to support the trial court’s findings and
conclusions that (1) DBHL’s losses did not result from or arise out of Moen’s
conduct and (2) DBHL was wholly responsible for its liability arising from the
defective part, and consequently, Moen owes no contractual indemnity to DBHL. 
DBHL further contends that the trial court erred in dismissing DBHL’s claim for
statutory indemnification on summary judgment because Moen satisfies the
statute’s definition of “manufacturer.”  Finding no error, we affirm.

Background

          In December 2002, DBHL
acquired Moen’s specialty plumbing parts business.  In addition to Moen’s
existing product lines, DBHL acquired prototypes of products in development,
including a toilet tank part known as a “fill valve” or a “ballcock,” built
with a polypropylene shank rather than with the polyvinyl chloride (PVC) shank
Moen primarily used to make ballcocks in its existing products.  

Moen considered the
change from PVC to polypropylene to be significant and, accordingly, treated
the polypropylene ballcock as a new product under its standard development and
testing procedures.  This meant that Moen would not release ballcocks with a polypropylene
shank for sale to the public until they passed rigorous testing.  Before the
sale to DBHL, Moen’s reliability engineer devised a three-stage test plan for
the polypropylene ballcock project.  Moen conducted the first stage, which
involved prototype testing, with custom-made samples of the product, using
different tooling and manufacture methods but not the methods used to
mass-produce products sold to the public.  

The second and third
stages of the test plan involved production part approval process (PPAP)
testing—which included installation torque testing to evaluate the strength of
the mounting nut—and product verification testing.[1] 
These two stages use samples of the product made with the same equipment and by
the same method that would be used to mass produce the products for sale to the
public, assuming satisfactory results.  Moen, however, did not complete these
testing stages before the sale to DBHL because it had not obtained the required
production equipment modifications.  Before the parties executed the APA, DBHL
knew that the propylene ballcocks and design changes were not complete and
that, before DBHL could consider releasing the polypropylene ballcocks to the
public, it would have to, among other things, obtain production tooling,
conduct production part approval process testing on actual samples, and pass
all required code compliance testing.  

As part of the sale of
the business, Moen gave DBHL its files containing the test plan.  At that
point, DBHL assumed sole responsibility and control for going forward with the
polypropylene ballcock project Moen had initiated.  DBHL decided to proceed
with development and commercial production without reviewing any of the testing
results Moen had previously provided to it.  From the December 2002 sale
closing date until August 2003, DBHL continued to sell the PVC ballcocks that
Moen had been selling, but continued to develop the polypropylene ballcocks,
without input from Moen, including making its own design decisions and obtaining
and approving production tooling.  DBHL deviated from Moen’s testing protocol:
it released the polypropylene ballcocks for commercial sale in September 2003
without having conducted any of the planned installation torque testing on
them.

DBHL sold the ballcocks
primarily to original equipment manufacturers (OEMs).  By December 2003, DBHL
began to receive reports from one of the OEMs that its polypropylene ballcocks
were failing in unprecedented numbers, and specifically, that the new shank
attached to the ballcock was breaking during assembly.

Based on these reports,
DBHL decided to immediately modify the ballcocks by thickening the shank, but
did not remove the product from the market.  By early March 2004, however, DBHL
began to receive more reports that the polypropylene ballcocks were failing in
the field.  Such a failure was catastrophic in the sense that it caused water
to overflow from the toilet, potentially resulting in substantial damage to the
end users’ property.  

DBHL removed the
polypropylene ballcocks from the market in May 2004, after it had sold
approximately 1.6 million of them.  

The OEMs sued DBHL to
recover the payments they had made to settle their customers’ property damage
claims, and they sought to hold DBHL liable under various theories, including
strict liability, negligence, defective design, and failure to warn.  The OEMs
alleged that DBHL was negligent with respect to the design, manufacture,
quality, testing, and/or sale of the ballcocks, negligent in its failure to
notify customers of prior complaints about the ballcocks, and negligent in its
failure to properly investigate complaints about the ballcocks.  The OEMs also
brought claims for breach of contract, and breach of express and implied
warranties, arising out of DBHL’s alleged failure to provide a product that
conformed to the requirements of DBHL’s contracts with the OEMs, and, in two of
the complaints, claims that DBHL intentionally misrepresented that the
polypropylene ballcock was an improved product and that it had been adequately
researched, certified, and tested.  

          DBHL reached a settlement
with the OEMs and resolved those cases by paying the OEMs approximately $27
million.  In settling the OEM claims, DBHL named Moen as a “released party” in
the settlement agreements, but reserved its rights to sue Moen “based on
contribution, indemnity, negligence, strict liability, breach of contract or
any other theory of recovery, legal, equitable, or otherwise.”  The OEMs agreed
to “cooperate reasonably” in DBHL’s effort to obtain reimbursement from Moen of
the consideration paid in connection with the settlement, including an
agreement to file suit against Moen if needed to preserve DBHL’s contribution
rights.  DBHL then demanded that Moen indemnify it for losses caused by the
ballcock failures.  Moen refused, and DBHL filed this suit.  

Discussion

I.       Contractual
indemnity  

DBHL challenges the trial
court’s conclusion that Moen did not owe DBHL contractual indemnity, in whole
or in part, as well as the legal and factual sufficiency of its findings of
fact undergirding that conclusion.  We first consider the scope of the parties’
contractual indemnity provision in the APA in determining the propriety of the
trial court’s challenged rulings.  Courts may not expand the parties’ rights or
responsibilities beyond the limits defined in an indemnity contract.  Hong
Kong Dev., Inc. v. Nguyen, 229 S.W.3d 415, 458 (Tex. App.—Houston [1st
Dist.] 2007, no pet.) (citing Ideal Lease Serv., Inc. v. Amoco Prod. Co.,
662 S.W.2d 951, 953 (Tex. 1983)).  The APA declares that Delaware law applies
to its interpretation.  We consider both Delaware law and, where the applicable
rules do not substantially differ, Texas law, in reviewing DBHL’s contractual challenge. 


A.      Standard of
Review

We defer to the trial
court’s properly supported factual findings.  In an appeal from a bench trial,
a trial court’s findings of fact have the same weight as a jury’s verdict so
long as evidence exists in the record to support them.  Amador v. Berrospe,
961 S.W.2d 205, 207 (Tex. App.—Houston [1st Dist.] 1996, writ denied).  We
review the sufficiency of the evidence supporting challenged findings of fact by
applying the same standards that we use in reviewing the legal or factual
sufficiency of the evidence supporting jury findings.  Catalina v. Blasdel,
881 S.W.2d 295, 297 (Tex. 1994).  We review de novo a trial court’s conclusions
of law and uphold them on appeal if the judgment can be sustained on any legal
theory supported by the evidence.  BMC Software Belg. v. Marchand, 83
S.W.3d 789, 794 (Tex. 2002); In re Moers, 104 S.W.3d 609, 611 (Tex.
App.—Houston [1st Dist.] 2003, no pet.).

The test for legal sufficiency
is “whether the evidence at trial would enable reasonable and fair-minded
people to reach the verdict under review.”  City of Keller v. Wilson,
168 S.W.3d 802, 827 (Tex. 2005).  In making this determination, we credit
favorable evidence if a reasonable fact-finder could, and disregard contrary
evidence unless a reasonable fact-finder could not.  Id.  If the
evidence falls within the zone of reasonable disagreement, then we may not
substitute our judgment for that of the fact-finder.  Id. at 822.  The
fact-finder is the sole judge of the credibility of the witnesses and the
weight to give their testimony.  Id. at 819.  In reviewing a factual
sufficiency challenge, we consider and weigh all of the evidence supporting and
contradicting the challenged finding and set aside the finding only if the
evidence is so weak as to make the finding clearly wrong and manifestly
unjust.  Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986); see Plas-Tex,
Inc. v. U.S. Steel Corp., 772 S.W.2d 442, 445 (Tex. 1989).

B.      Indemnity
obligations imposed by the APA

Section 9.3(a) of the APA
states:

Subject
to Sections 9.1 and 9.2, from and after the Closing, Seller shall
indemnify, defend and hold harmless Purchaser and its Affiliates (including
Foreign Purchaser) and their respective directors, officers, employees and
representatives (collectively, “Purchaser Indemnitees”) from and
against any and all claims, demands or suits (by any Person, including any
Governmental Authority), losses, liabilities, damages, fines, penalties, obligations,
payments, costs and expenses, paid or incurred, whether or not relating to,
resulting from or arising out of any Third Party Claim, including the costs and
expenses of any and all actions, suits, proceedings, demands, assessments,
judgments, settlements, and compromises relating thereto and reasonable
attorneys’ fees in connection therewith (collectively, “Losses”) (provided,
that Losses shall not include any indirect, consequential or punitive damages
of any Purchaser Indemnitee, including damages for lost profits and lost
business opportunities, or any Losses to the extent reimbursed pursuant to
insurance policies insuring any Purchaser Indemnitee with respect thereto or
otherwise recovered from third Persons, but not excluding any portion of such
Loss that would pursuant to the terms of such insurance or other arrangement
ultimately be borne by any Purchaser Indemnitee relating to, resulting from or
arising out of any deductible or other like arrangement) (individually and
collectively, “Indemnifiable Purchaser Losses”) resulting from or
arising out of any of the following:

(i)      any
breach by Seller of any of the representations or warranties of Seller
contained in this Agreement;

(ii)      any
breach by Seller or Foreign Seller of any covenant of Seller or Foreign Seller
contained in this Agreement;

(iii)     other
than with respect to the Assumed Liabilities, the conduct of the Business or
any part thereof or the ownership, use or lease of any Asset, in each case,
prior to the Closing Date; and

(iv)     any
Excluded Liability.

(italics added; underscoring in
original).  In applying this provision to the underlying claims, the trial
court found that “DBHL’s losses did not result from or arise out of the conduct
of Moen’s business” before the closing date.  DBHL challenges this finding,
asserting that the trial court erroneously relied on contentions in the
underlying lawsuits to determine whether DBHL’s losses arose from Moen’s
pre-closing conduct and failed to make an independent factual determination as
to whether the ballcock failures resulted from or arose out of the conduct of
DBHL, Moen, or both.  

As DBHL correctly notes,
a duty to indemnify is triggered by the facts, not merely any underlying
pleadings.  Tesoro Petroleum Corp. v. Nabors Drilling USA, Inc., 106
S.W.3d 118, 125 (Tex. App.—Houston [1st Dist.] 2002, pet. denied).  But, contrary
to DBHL’s assertion, the trial court did not rely merely on the allegations and
contentions in the underlying OEM lawsuits.  Rather, the trial court made
specific findings of fact concerning the events that gave rise to those
lawsuits, and reached its conclusions of law by applying the APA’s indemnity
provision in construing the effect of those events and each party’s
responsibility for them.  Accord Delle Donne & Assocs., LLP v. Millar
Elevator Serv. Co., 840 A.2d 1244, 1249–50 (Del. 2004) (applying jury
findings addressing proportionate negligence allocation in determining amount
of indemnity owed by each tortfeasor under reciprocal indemnity agreement).  

With respect to Moen’s
conduct, the trial court specifically found that, (1) at the time Moen sold the
business, it had not progressed beyond creating a small number of prototypes of
the polypropylene ballcocks and had not completed design verification testing
(findings 8, 24, 26, and 72); (2) that Moen never made any determination that
the polypropylene ballcocks were ready for release to the public (findings 25,
27, and 73); and (3) Moen provided DBHL with its test plan and made DBHL aware
that the polypropylene ballcocks required further testing and design
modifications before they would be ready for the market (findings 21, 26, 27,
31, and 32).

The trial court found
that DBHL “alone” (1) was responsible for the design of the shank threads and
the decision to use pure polypropylene in manufacturing the ballcocks (findings
78 and 79); (2) decided to put the polypropylene ballcocks on the market
without conducting the additional testing set forth on Moen’s test plan,
including the critical installation torque testing, which could have forewarned
them that the polypropylene ballcocks’ shank was too thin given the type and
grade of polypropylene used (findings 52 and 77); (3) decided to use existing
installation instructions that accompanied the PVC ballcocks without reviewing
them or making any effort to determine whether they needed revision (finding 80);
and (4) decided to introduce the polypropylene ballcocks into the stream of
commerce without ensuring that they had been sufficiently tested (findings 74
and 75).  Ultimately, the trial court found, DBHL attributed the ballcocks’
failure to the facts that: “(1) the type and grade of polypropylene chosen was
not as strong as PVC; (2) the shank of the ballcock was not thick enough given
the type of polypropylene used; and (3) the threads where the coupling nut
attached to the toilet tank were too sharp.”  (finding 71).  

These specific findings
support the trial court’s overarching determination that “[t]hese contributing
factors resulted from, and arose out of, DBHL’s conduct of the business after
the Closing Date,” and that, obversely, “DBHL’s consequential damages did not
arise out of, or result from, in whole or in part, Moen’s conduct of the
business prior to the Closing Date.”  (finding 71 and conclusion 106).  

DBHL next contends that
no evidence supports “the necessary finding of fact that DBHL paid to settle
its own liability,” and not, at least partially, Moen’s.  DBHL points to the
settlement agreements as “the only evidence in the record,” on this issue, and,
according to DBHL, these agreements show that DBHL paid to settle Moen’s
exposure.  This contention also lacks merit.  As the trial court found, each of
the underlying settlement agreements requires the OEM to cooperate with DBHL in
its effort to obtain contribution from Moen for the settlement, and assigns to
DBHL the right to pursue Moen.  Thus, Moen plainly was not “released” from
liability in the underlying settlements.  In any event, the trial court did not
limit its inquiry to the content of the release and settlement agreements in
factually determining whether DBHL’s losses resulted from or arose out of
Moen’s conduct before the closing date.  Rather, its findings of fact
specifically address the chronological sequence of events giving rise to the
OEM lawsuits and buttress the trial court’s determination that Moen was not
responsible for the losses DBHL incurred based on its commercial sale of the
product, which commenced after the closing.  The trial court based its findings
on the extensive testimony about these facts that it heard as the trier of
fact.

DBHL finally contends the
trial court erred by failing to apportion responsibility for the ballcock
failures between it and Moen, despite its conclusion that Moen is responsible
for its own attorney’s fees, a determination Moen chose not to appeal.  DBHL’s
contention confuses the concept of fault with the APA’s definition of “loss.” 
The APA defines “loss” as “losses, liabilities, damages, fines, penalties,
obligations, payments, cost and expenses, paid or incurred, whether or not
relating to, resulting from or arising out of any Third Party Claim including
the costs and expenses of any and all actions, suits, proceedings, demands,
assessments, judgments, settlements, and compromises relating thereto and
reasonable attorneys’ fees in connection therewith . . . .”  Under the APA,
“loss” includes attorney’s fees and costs in defending against lawsuits, which
is, according to the trial court’s findings, the only loss incurred by Moen. 
But with respect to fault, the trial court found that DBHL “alone” decided to
forego additional testing and, without making any design modifications or
revision to the installation instructions, place the polypropylene ballcock
into the stream of commerce.  The record supports these findings. 
Consequently, we detect no fatal inconsistency between the trial court conclusion
that Moen’s “losses”—i.e., the attorney’s fees that Moen incurred when the OEMs
sued it—did not result from or arise out of DBHL’s conduct after the closing
date with its conclusion that DBHL alone was responsible for the polypropylene
ballcock failures, and thus has no claim for contractual indemnity for the
losses DBHL sustained after the closing date.  

The trial court’s finding
that DBHL was solely responsible for releasing a defective product on the
market renders the case DBHL relies on, Delle Donne and Associates, LLP v.
Millar Elevator Service Co., factually inapposite.  840 A.2d 1244 (Del.
Sup. Ct. 2004).  In that case, Delle Donne, a building owner and manager, and
Millar, an elevator maintenance company, settled a third-party personal injury
claim before trial.  Millar paid $80,000 and Delle Donne paid the remainder of
a $175,000 settlement.  Id. at 1253.  In a separate suit, they pursued
cross-claims for contractual indemnity under reciprocal indemnity provisions.  Id. 
The jury found that Delle Donne was 65% liable and that Millar was 35% liable
for the injury.  Id.  The court adjusted each party’s financial burden
for the settlement accordingly, recognizing that an indemnitee was entitled to
recover partial contractual indemnity for losses caused by the indemnitor’s
negligence, measured by the percentages of liability determined by a jury.  Id.
at 1253–54.  

The trial court’s
apportionment of responsibility in this case harmonizes with the rule in Delle
Donne: finding that the damages were wholly attributable to DBHL’s conduct,
the trial court imposed full responsibility on DBHL and none on Moen.  Accordingly,
we hold that the trial court did not err in concluding that DBHL is not
entitled to contractual indemnity under the Asset Purchase Agreement.

II.      Statutory indemnity

          DBHL also challenges the
trial court’s summary judgment ruling that DBHL is not entitled to statutory
indemnity under Chapter 82 of the Texas Civil Practice and Remedies Code for
its payments to the OEMs.  We review a trial court’s grant of partial summary
judgment de novo.  Valence Operating Co. v. Dorsett, 164 S.W.3d 656, 661
(Tex. 2005); Provident Life Accid. Ins. Co. v. Knott, 128 S.W.3d 211,
215 (Tex. 2003).  Under the standard for traditional summary judgment, the
movant has the burden to show that no genuine issue of material fact exists and
that it is entitled to judgment as a matter of law.  Tex. R. Civ. P. 166a(c); KPMG Peat Marwick v. Harrison
County Hous. Fin. Corp., 988 S.W.2d 746, 748 (Tex. 1999).  “When reviewing
a summary judgment, we take as true all evidence favorable to the nonmovant and
indulge every reasonable inference and resolve any doubts in the nonmovant’s
favor.”  Knott, 128 S.W.3d at 215; Sci. Spectrum, Inc. v. Martinez,
941 S.W.2d 910, 911 (Tex. 1997); see Dorsett, 164 S.W.3d at 661.  

          Section 82.002(a) of the
Texas Civil Practice and Remedies Code provides that “[a] manufacturer shall
indemnify and hold harmless a seller against loss arising out of a products
liability action, except for any loss caused by the seller’s negligence,
intentional misconduct, or other act or omission, such as negligently modifying
or altering the product, for which the seller is independently liable.”  Tex. Civ. Prac. & Rem. Code Ann.
§ 82.002 (Vernon 2005).  The statute defines a “manufacturer” as “a
designer, formulator, constructor, rebuilder, fabricator, producer, compounder,
processor or assembler of any product or any component part thereof and who
places the product or any component part thereof in the stream of commerce.”  Id.
§ 82.001(4).  Here, the undisputed evidence demonstrates that Moen had no
involvement in placing the polypropylene ballcock into the stream of commerce. 
Because Moen cannot be a “manufacturer” without placing the product into the
stream of commerce, DBHL is not entitled to statutory indemnity from Moen. 
Accordingly, the trial court correctly held that DBHL’s statutory
indemnification claim fails as a matter of law.  See Owens & Minor, Inc.
v. Ansell Healthcare Prods., Inc., 251 S.W.3d 481, 482, 489 (Tex. 2008) (holding
that statute does not require manufacturer to indemnify against claims
involving products other manufacturers released into stream of commerce).  




Conclusion

Legally and factually
sufficient evidence supports the trial court’s findings that (1) DBHL’s losses
did not result from or arise out of the conduct of Moen’s business prior to the
APA’s closing date and (2) DBHL was wholly responsible for the losses it
incurred due to its product’s commercial failure.  These findings support the
trial court’s legal conclusion that Moen owes no contractual indemnity to
DBHL.  Further, the trial court did not err in granting summary judgment in
favor of Moen on DBHL’s section 82.002 statutory indemnification claim.  We
therefore affirm the judgment of the trial court.

 

 

                                                          Jane
Bland

                                                          Justice

 

Panel consists of Justices Bland,
Sharp, and Taft.[2]

 

 

 

 

 

 









[1] Moen conducted installation torque testing on all
products with threaded attachments.  The test involves inserting each sample
into a hole in a test plate, installing a mounting nut on the threading, then
twisting the mounting nut down on the sample until it fails.  





[2]
Justice Tim Taft, who retired from the First
Court of Appeals on June 1, 2009, continues to sit by assignment for the
disposition of this case, which was submitted on March 24, 2009.