Opinion filed April 14,
2011

 

                                                                       In The

                                                                              

  Eleventh
Court of Appeals

                                                                   __________

 

                                                         No. 11-09-00328-CV

                                                    __________

 

                                      LARRY
T. LONG, Appellant

 

                                                                 
V.

 

                                    
RIM OPERATING, INC., Appellee



 

                                   On
Appeal from the 106th District Court

                                                          Dawson
County, Texas

                                                Trial
Court Cause No. 08-06-17940

 



 

O
P I N I O N

This
is a dispute over the ownership of a working interest in a 160-acre tract of
land in
Dawson County.  RIM Operating, Inc. filed suit against Larry T. Long seeking a declaratory
judgment that Long relinquished his interest to other working interest owners
when he did not consent to a workover operation.  The trial court granted
summary judgment for RIM and awarded it attorney’s fees.  We reverse the
attorney’s fee award and remand for a factual determination but otherwise
affirm the trial court’s judgment.

I.  Background Facts

The
160-acre tract for which this dispute concerns was leased with ten leases
(Lindsey Leases).  The properties covered by the Lindsey Leases are not
uniform, but all include the eastern portion of Section 109.[1] 
In January 1995, the working interest owners executed an A.A.P.L. Form 610-1982
Model Form Operating Agreement (JOA) that covered all of Section 109.  In 1997,
the Lindsey Trust 109-A No. 1 Well (Lindsey Well) was drilled in the southeastern
corner of Section 109.  The Lindsey Leases provide that a well maintains the
lease only as to the proration unit designated by the Railroad Commission.  In
1998, the operator filed an affidavit in the real property records of Dawson
County designating a 160-acre proration unit surrounding the Lindsey Well.[2]
 A survey showing the unit and well location was attached to the affidavit.

Forcenergy
was a working interest owner in the Lindsey Well.  It assigned its interest in
the Lindsey Well and one other well, along with the underlying leases, to Long
on December 1, 2000.  Long concedes that his interest is subject to the 1995
JOA.[3] 
RIM became operator of the Lindsey Well in October 2004.

The
Lindsey Well was the only producing well on the 160-acre tract.  On December
19, 2006, the Lindsey Well ceased to produce because of parted rods.  On
January 10, 2007, RIM submitted an AFE (Authorization for Expenditure) to all
working interest owners proposing a workover, or repair, operation.  The total
estimated cost was $320,686.  Long’s share was $124,540.  Long did not
respond.  RIM attempted to repair the Lindsey Well, and it determined that
there was a partial casing collapse.  In July 2007, RIM drilled a replacement
well and reestablished production.

The
JOA provides that, if a working interest owner goes nonconsent on a proposed
operation, it relinquishes its right to any production from that well until its
share of the costs, plus an additional 200% or 500% depending upon the type of
cost incurred, has been recouped by the consenting parties.  However, for operations
denominated as “Required Well or Operations,” JOA Article XV.K. provides:

Notwithstanding
anything to the contrary herein contained, it is understood and agreed that the
non-consent provisions of Article VI.B.2. shall not be applicable to any well
or operation which is necessary to perpetuate an expiring lease or leases* or
to earn an interest in a lease or leases pursuant to any farmout or other
agreement.  To “earn an interest” as abovementioned is herein understood to
include completion operations if production is required to earn, whether or not
drilling has extended the lease or continued the right to drill.  Any well
drilling or other operation which is necessary to perpetuate or earn a lease or
interest therein shall be deemed to be a “required well” or “required
operation.”  As to any required well or required operation proposed by any
party hereto in which any other party hereto elects not to participate, the non-participating
party shall release and relinquish forever proportionately to the participating
parties all of non-participating party’s interest in and to the lease or leases
or interest (“relinquished leases”) herein which would be perpetuated by such
required well or required operation.  The interest in such relinquished leases
shall be assigned by the non-participating party to the participating parties
without warranty of title except as to claims by, through or under assignor and
shall be free of any additional burdens as is provided for in Article III.D
hereof.  All other leases or interests in which the non-participating party
owns an interest which are pooled with the relinquished leases to form a
proration unit under the regulations of the governmental authority having
jurisdiction shall be subject to Article XV.L. herein.  Nothing herein shall be
construed to require the reduction of such non-participating party’s interest
in any producing wells or units.

 

*As
used in this section, an expiring lease(s) is defined to be any oil and gas
lease which would expire within 60 days of the commencement of the proposed
operation but will not then expire if such operation is commenced.

 

In
January 2008, RIM forwarded Long an assignment of his interest in the 160-acre
tract to the consenting parties.  Long did not respond.  RIM then filed this
declaratory judgment action.

II.  Issues

Long challenges the trial court’s judgment with eleven
issues.  Long argues first that the trial court erred because the JOA violates
the statute of frauds.  Long argues in Issues Two and Five that there are
unresolved fact questions. In Issue Three, he contends that conditions pre-cedent
were unsatisfied.  He argues in Issue Four that there was no evidence of the
actual commencement date of the rework operation.  In Issue Six, Long argues
that the JOA contains an unenforceable penalty.  In Issue Seven, he contends
that the JOA’s forfeiture provision is unenforceable.  In Issue Eight, he
argues that the JOA violates the Rule Against Perpetuities.  He contends in
Issue Nine that the trial court lacked subject-matter jurisdiction because RIM
did not have standing.  In Issue Ten, he argues that the trial court erred by
denying his plea in abatement.  Finally, in Issue Eleven, he contends that the
trial court erred by granting attorney’s fees because there were unresolved
questions of fact.




 

III. 
Special Exception

Long’s
brief begins with a discussion of his special exception to RIM’s motion for
summary judgment.  We assume that this was intended as an introduction to his
other issues because he raises no specific issue complaining of the trial
court’s ruling.  Even if we are incorrect, Long has identified no error with
respect to his special exception.

IV. 
Jurisdiction

Long
complains that the trial court lacked jurisdiction because RIM lacked
standing.  Specifically, Long complains that RIM is improperly using a suit for
declaratory judgment to affirmatively alter the rights, status, and legal
relationships of the parties to the JOA by forcing him to assign his interests and
that RIM suffered no legal injury because it owns no interest in the well and,
therefore, is not entitled to an assignment of his interest.

Standing
is a prerequisite to subject-matter jurisdiction.  Bland Indep. Sch. Dist.
v. Blue, 34 S.W.3d 547, 553, 558 (Tex. 2000).  A party has standing if: (1)
it has sustained, or is immediately in danger of sustaining, some direct injury
as a result of the defendant’s wrongful act; (2) it has a direct relationship
between the alleged injury and the claim being adjudicated; (3) it has a
personal stake in the controversy; (4) the challenged action has caused it some
injury in fact, either economic, recreational, environmental, or otherwise; or
(5) it is an appropriate party to assert the public’s interest in the matter,
as well as its own.  Walton v. City of Midland, 287 S.W.3d 97, 100 (Tex.
App.—Eastland 2009, pet. denied).

Whether
a court has subject-matter jurisdiction is a question of law and, therefore, is
reviewed de novo.  Tex. Natural Res. Conservation Comm’n v. IT-Davy, 74
S.W.3d 849, 855 (Tex. 2002).  Initially, we determine jurisdiction by
considering whether a plaintiff has alleged facts that affirmatively
demonstrate a trial court’s subject-matter jurisdiction.  Tex. Dep’t of
Parks & Wildlife v. Miranda, 133 S.W.3d 217, 226 (Tex. 2004).  The
pleadings are construed liberally in favor of the plaintiff, and we look to the
pleader’s intent.  Tex. Ass’n of Bus. v. Tex. Air Control Bd., 852
S.W.2d 440, 446 (Tex. 1993).  In some instances, however, consideration of
evidence and resolution of disputed facts are necessary to determine
jurisdiction.  Miranda, 133 S.W.3d at 226.  In that instance, we
consider any relevant evidence submitted by the parties when necessary to
resolve the jurisdictional issue raised.  Id. at 227.

The
trial court had subject-matter jurisdiction.  District courts have a broad
grant of jurisdiction to resolve disputes.  Consequently, a constitutional
presumption exists that they are authorized to resolve a dispute.  In re
Entergy Corp., 142 S.W.3d 316, 322 (Tex. 2004).  Tex. Civ. Prac. & Rem. Code Ann. § 37.004(a) (Vernon
2008) specifically vests trial courts with the jurisdiction to hear requests
for declaratory relief from persons interested under a written contract, to
determine any question of construction or validity arising under that contract,
and to issue a declaration of rights, status, or other legal relations under
that contract.

RIM
was an interested party.  RIM’s live pleading, its third amended petition,
alleged that it was the operator of the land in dispute, that Long’s interest
was subject to the terms of a JOA, that this JOA covered the Lindsey 109-A No.
1 well, that Long failed to respond to an AFE seeking approval of a repair to
the well, and that, therefore, he was deemed to have relinquished his interest
to the participating parties.  RIM also provided the court with a copy of the
P-4 naming it operator of the Lindsey Trust “109” A Lease and an affidavit from
its senior landman offering testimony that Goodrich Petroleum Company of
Louisiana transferred operation of the Lindsey Well to RIM effective October 1,
2004.

RIM
did not seek inappropriate relief.  RIM sought a declaratory judgment that (1)
Long was bound by the terms of the JOA, (2) Long refused to consent to
operations necessary to perpetuate the leasehold, (3) Long has forfeited his
interest in the leasehold, (4) Long’s interest is now owned by the consenting
working interest owners, and (5) Long’s forfeiture was effective no later than
thirty days after February 5, 2007.  Contrary to Long’s argument, these were
not requests to affirmatively alter the rights, status, and legal relationships
of the parties to the JOA by forcing him to assign his interests.  First, RIM merely
sought clarification of the parties’ current ownership interests.  Second, RIM
did not request specific performance.

Finally,
it was unnecessary for RIM to own an interest in the well to have standing.  As
the operator, it is responsible to the working interest owners and, therefore,
has an interest in determining who they are.  Because the working interest
owners’ rights and liabilities depend, in part, on their percentage of
ownership, RIM also has an interest in determining those percentages.  RIM
established that a justiciable controversy existed because of Long’s alleged
failure to respond to the AFE and the possibility that this failure resulted in
a forfeiture of his interest in favor of the consenting working interest
owners.  The trial court, therefore, did not err by denying his plea to the
jurisdiction.  Issue Nine is overruled.

Long
also argues that the trial court lacked jurisdiction because it could not issue
a declaratory judgment as to parties who were not before it.  There is no
dispute that the parties to whom RIM alleges Long is contractually obligated to
assign his interest in the Lindsey Well are not parties.  Tex. Civ. Prac. & Rem. Code Ann. §
37.006(a) (Vernon 2008)  provides that, “[w]hen declaratory relief is sought,
all persons who have or claim any interest that would be affected by the
declaration must be made parties.  A declaration does not prejudice the rights
of a person not a party to the proceeding.”  Because this suit could result in
a declaration that the consenting working interest owners are entitled to a
portion of Long’s interest, they are undoubtedly permissive parties.  But their
absence did not deprive the trial court of jurisdiction.  This court has held
that all royalty owners are not required to be joined in a declaratory judgment
action seeking a declaration that a lease had terminated and that a unit was
void.  Sabre Oil & Gas Corp. v. Gibson, 72 S.W.3d 812, 816 (Tex.
App.—Eastland 2002, pet. denied).  We noted in that case that, even though the
missing royalty owners had an interest in the litigation because their share of
the production from the pooled unit would be affected, their presence was
unnecessary to determine whether Sabre pooled in bad faith and breached the
terms of the lease.  Id.

The
same situation is present here.  The other working interest owners have an
interest in this litigation, but their presence was unnecessary for the trial
court to determine whether JOA Article XV.K. required Long to assign his
interest to them.  Issue Ten is overruled.

V.  Statute
of Frauds

Long contends that JOA Article XV.K.
violates the statute of frauds, Tex.
Bus. & Com. Code Ann. § 26.01 (Vernon 2009).  Specifically, Long
complains that there is no designation or description of the assignor or assignees,
that there is an insufficient description of the interests in the leases to be
released and assigned, and that there is no reference to an extrinsic writing
sufficient to supply the missing information.  As we understand Long’s
position, Article XV.K. violates the statute of frauds because the day it was
executed the parties conditionally agreed to convey real property interests in
the future but did so without knowing what interests they could be required to
assign or to whom those assignments would be made.  RIM responds that we must
look beyond Article XV.K. and consider the four corners of the JOA; that we
must also consider any documents referenced in the JOA or otherwise in Long’s
chain of title; and that, when we do so, all the information necessary to
satisfy the statute of frauds will be found.

The statute of frauds requires that the
property to be conveyed be adequately described by providing the means or data
by which it may be identified with reasonable certainty.  Kmiec v. Reagan,
556 S.W.2d 567 (Tex. 1977).  The description cannot be arrived at from tenuous
inferences and presumptions of doubtful validity.  Rowson v. Rowson, 275
S.W.2d 468 (Tex. 1955).  The description must be either in the writing itself
or in another existing document specifically referenced in the writing.  Wilson
v. Fisher, 188 S.W.2d 150 (Tex. 1945).  The certainty of the contract may
be aided by parol evidence in limited situations.  Essential elements may never
be supplied.  The details that merely explain or clarify the essential terms
appearing in the instrument may ordinarily be shown by parol evidence.  But the
parol evidence must not constitute the framework or skeleton of the agreement. 
That framework must be contained in the writing.  Thus, the resort to extrinsic
evidence is not for the purpose of supplying the location or description of the
land, but only for the purpose of identifying it with reasonable certainty from
the data in the memorandum.  Swinehart v. Stubbeman, McRae, Sealy, Laughlin
& Browder, Inc., 48 S.W.3d 865, 877 (Tex. App.—Houston [14th Dist.]
2001, pet. denied).

Long initially argues that there is no
proper description of the assignor or assignee within JOA Article XV.K.  We
disagree with both Long’s inference and his conclusion.  First, we disagree
with his inference that our analysis is limited to the language of JOA Article
XV.K.  We can, instead, consider the entire agreement and any other documents
referenced in that agreement.  Second, we disagree that the JOA fails to
adequately identify the assignors and assignees.  The JOA itself is limited to
the parties to that agreement.  From this group, assignors will be those who do
not participate in a required well or operation.  The assignees will be those
who do.

Long next argues that Article XV.K. contains
an insufficient description of the leases to be released and assigned.  Again,
we disagree.  The first page of the JOA defines the contract area as:

See Exhibit “A”
Attached Hereto[.]  All of Section 109, the N/2 of Section 108 and the W/4 of
Section 94, Block M, EL&RR Ry. Company Survey COUNTY OR PARISH OF Dawson STATE
OF Texas.

 

Exhibit “A” to
the JOA further defines the lands subject to the agreement as:

 

Tract No. 1:     The
East 3/8th acres of Section 109

Tract No. 2:     The
West 5/8th acres of Section 109

. . . .

 

[A]ll in Block M,
EL&RR Ry. Co. Survey, Dawson County, Texas from the surface of the earth to
all depths.

 

Exhibit “A”
continues with descriptions of each of the leases covering each tract.  The
JOA, therefore, adequately described the lands to which it was subject.

Long
is correct that, at the time the JOA was signed, the parties did not know which
leases would be expiring if Article XV.K. was invoked or even if the expiring
leases were described in Exhibit “A” or would be subsequently acquired leases. 
This, however, is not fatal.  In Westland Oil Development Corp. v. Gulf Oil
Corp., 637 S.W.2d 903 (Tex. 1982), the court considered whether an AMI (Area
of Mutual Interest) provision in a letter agreement was enforceable.  One of
the challenges to the provision was the contention that it violated the statute
of frauds.  The AMI provision read:

            5.  If
any of the parties hereto, their representatives or assigns, acquire any
additional leasehold interests affecting any of the lands covered by said
farmout agreement, . . . such shall be subject to the terms and provisions of
this agreement.

 

637 S.W.2d at
905.  This AMI provision suffers from the same problem raised by Long.  There was
a reference to a contractual area, and there was a conditional agreement to
assign interests in the future within this contractual area.  But, the AMI did
not specifically identify what interest would be assigned because no one knew
whether any additional interest would be acquired, let alone what those
interests might be.  Despite this, the court held that the provision did not
violate the statute of frauds because the farmout agreement contained a
sufficient description of the three sections it covered.  Id. at 909.[4] 


A
comparable situation exists here.  The original parties did not know if Article
XV.K. would be invoked and, if so, exactly what interest would be assigned or who
would be required to assign.  They did, however, know that Article XV.K. was
limited to the JOA’s contract area.  Because that area is sufficiently
described, the agreement does not violate the statute of frauds.  Issue One is
overruled.

VI. 
Conditions Precedent

Long argues that two conditions precedent to
the application of Article XV.K. were not met.  First, Long argues that the
consent of all consenting parties was not obtained.  Long relies upon JOA
Article VII.D.2. to contend that a well may not be reworked without first
obtaining this consent.[5] 
Long is correct that the JOA requires prior consent before engaging in any
reworking operations.  Article XV.K., however, makes this provision
inapplicable for required operations.  The article begins “[n]otwithstanding
anything to the contrary,” and then it specifically excludes the consent
provisions of Article VI.B.2.  Because Article VI.B.2. creates the consenting
parties, by excluding it, Article XV.K. necessarily excludes Article VII.D.2.
as well.

Long next argues that there was no evidence
that the operation was proposed by a party to the JOA because there is no
evidence that RIM is a party to the JOA.  Long contends that there was disputed
evidence whether RIM was the operator, but he points to no conflicting evidence. 
RIM offered the affidavit of a senior landman, Debby Harrington.  She testified
that Goodrich Petroleum transferred operation of the Lindsey Well to RIM on
October 1, 2004.  She identified the JOA and a letter and AFE sent by RIM to
Long proposing the repair operation on the Lindsey Well.  RIM also produced a
copy of the P-4 that named RIM operator of the Lindsey Well as of October 1,
2004.  Finally, RIM offered the affidavit of its controller, Thomas M. Murphy.  He
authenticated over 150 pages of joint interest billings for the Lindsey Well
sent by RIM to Long and payment records evidencing payments to Long for his
share of the Lindsey Well’s production.  In the absence of any conflicting
evidence, RIM offered sufficient evidence to establish that it was the operator
of the Lindsey Well and was a party to the JOA.  Issue Two is overruled.

Long correctly notes that the record does
not establish that RIM was properly selected as successor operator pursuant to
Article V. of the JOA and that no evidence was produced that RIM owned any
interest in any of the leases covered by the JOA.  Neither, however, is of any
moment.  Long may have had grounds to challenge RIM’s selection as successor
operator, but there is no evidence that he ever complained of RIM’s selection. 
Instead, the evidence establishes that, prior to the disputed operation, he
paid RIM’s bills and accepted his share of production.  Long has, therefore,
waived the right to complain of RIM’s status as operator.  Abraxas Petroleum
Corp. v. Hornburg, 20 S.W.3d 741, 750-52 (Tex. App.—El Paso 2000, no
pet.).  Issue Three is overruled.

VII. 
Penalty

Long contends that Article XV.K. creates an
unenforceable penalty or forfeiture.  The supreme court considered the
enforceability of nonconsent penalties in Valence Operating Co. v.
Dorsett, 164 S.W.3d 656 (Tex. 2005).  In that case, the operator proposed
drilling eight wells.  Dorsett did not consent to any of them.  164 S.W.3d at 660. 
The parties’ JOA imposed a 300% nonconsent penalty.  Id.  Dorsett
contended that this penalty was an unenforceable liquidated damages provision. 
Id. at 664.  The supreme court disagreed, finding that the clause
rewarded consenting parties for undertaking a defined risk.  The court also
noted that liquidated damages are recoverable only where there has been a
failure to perform a contractual obligation; a nonconsent election, however, is
a contractual right.  Consequently, nonconsent penalties are not liquidated
damages. Id. at 664-65.  Instead, they are an incentive for the risk takers
by allowing reasonable compensation for agreeing to participate in new wells.

A similar situation is present here.  The
JOA contains standard nonconsent language for most operations.  The parties,
however, elected to include a customized provision for a specific class of
operations.  Required wells or required operations were defined as those
necessary to perpetuate or earn a lease or interest therein.  RIM produced
evidence that the Lindsey Well was the only producing well on its proration
unit and that, therefore, if the proposed rework operation was not performed,
the leases would expire as to that proration unit.  Long had a choice: agree to
participate in operations to keep the leases in force or not.  He chose not to
participate.  If the other working interest owners had made the same decision, the
leases would have terminated, and Long would be in the same position he is in
now.  But, they did not.  They agreed to accept the financial risk of keeping
the leases intact by undertaking a workover.  The extent of this risk is
highlighted by the fact that RIM knew the rods had parted and suspected a
casing leak.  Under the best case scenario, the cost to repair the well was
$320,686, but RIM warned the working interest owners that it might be necessary
to sidetrack and redrill the well.  We know today that not only was this
additional expense incurred but, in fact, the consenting working interest owners
ultimately paid to drill a replacement well.  Because the consenting owners agreed
to this risk and because Long is in no different position than he would be if
the Lindsey Leases had not been maintained, Article XV.K. is not an
unenforceable penalty or forfeiture.  Issues Six and Seven are overruled.




 

VIII. 
Rule Against Perpetuities

Long also argues that Article XV.K. creates a future
executory interest in real property in violation of the rule against perpetuities. 
Texas courts have held that the rule against perpetuities is only a means of
preventing unreasonable restraints on alienation and, therefore, does not bar
enforcement of contractual rights to sell property that does not constitute an
unreasonable restraint on alienation.  See, e.g., Cherokee Water Co. v.
Forderhause, 641 S.W.2d 522, 526 (Tex. 1982) (preferential purchase right
did not violate the rule against perpetuities).[6] 
Article XV.K. is not an unreasonable restraint on alienation because it does
not prevent a working interest owner from selling its interest, restrict their
ability to do so at a time of their choice, constrain to whom they may sell, or
limit the price to which they may agree.  Issue Eight is overruled.

IX. 
Other Issues

Long’s list of issues includes Issues Four
and Five complaining of unresolved fact questions and Issue Eleven complaining
of the award of attorney’s fees.  Long did not brief any of these issues in the
argument section of his brief, and RIM argues that they have been waived.  See
Trenholm v. Ratcliff, 646 S.W.2d 927, 934 (Tex. 1983) (listing of points
without argument and authorities constituted waiver).  Long responds in his
reply brief that these issues are briefed, contends that there is no authority
limiting where an issue may be argued, and points us to his factual summary for
his arguments.  However, Tex. R. App. P.
38.1(g) provides that the statement of facts “must state concisely and without
argument the facts pertinent to the issues or points presented.”  Rule 38.1(i)
defines the argument section of the brief as containing “a clear and concise
argument for the contentions made, with appropriate citations to authorities
and to the record.”  Consequently, RIM is correct.  Issues Four, Five, and
Eleven have not been preserved.   In the interest of justice, however, we will
consider them.

In Issue Four, Long complains that there was
no evidence that any relinquishment duty owed by Long under Article XV.K. arose
because there was no evidence of the actual commencement date of the rework
operation.  Because the operation was proposed under Article XV.K. rather than
Article VI.B.1. or Article VI.B.2., it was unnecessary to prove the actual date
the rework operation commenced.  

Long argues that there was no evidence that
the proposed operations were legitimate operations that invoked Article XV.K. 
Jason B. Rouse, an engineer for RIM, testified that the Lindsey Well was the
only producing well on the 160-acre proration unit and that it ceased to
produce because of parted rods.  This is sufficient to establish that the
repair was a required operation as defined by Article XV.K.  Long also
complains that there was insufficient evidence that RIM was the operator.  We
have previously held otherwise.  Issue Four is overruled.

Long’s fifth issue complains of several
unresolved fact questions.  Issue 5(a) contends that there was insufficient
evidence describing his interest in the oil and gas leases within the proration
unit.  We have previously held that the JOA satisfied the statute of frauds,
and Long has conceded that the JOA applied to his interest.  Moreover, Long
acquired his interest from Forcenergy Onshore Inc.  The assignments into
Forcenergy all referenced the JOA.  He was, therefore, bound not only by that
agreement but also by all the property descriptions contained within it.[7] 
We note also that the assignment from Forcenergy to Long specifically referred
to the “W6613 – Lindsey Trst 109 A1” Well.  Prior to his assignment, the
operator filed an affidavit in the real property records designating a proration
unit for a 160-acre tract surrounding the Lindsey Trust “A” No. 1 Well.  The
affidavit provided a legally sufficient description of the proration unit.  Collectively,
this is sufficient to describe the interests Long must assign because of his
decision to go nonconsent on the workover.  Issue 5(a) is overruled.

In Issue 5(b) Long contends that there was a
fact question on whether the Lindsey Well is subject to the JOA.  Long conceded
in open court that his interest was subject to the JOA, and the assignments
into Forcenergy, his predecessor in title, refer to the JOA.  Issue 5(b) is
overruled.

Long argues in Issue 5(c) that there was
insufficient evidence that RIM was a party to the JOA.  We have previously
found that RIM was the operator.  Issue 5(c) is overruled.

Long argues in Issue 5(d) that there was
insufficient evidence that he breached Article XV.K.  RIM offered
uncontroverted evidence that by correspondence dated January 10, 2007, it sent
the working interest owners an AFE to find and repair a suspected casing leak.  It
produced a certified mail receipt evidencing that Long received this
correspondence on January 30, 2007.  It also offered affidavit testimony
that Long did not respond to the AFE or the request for an assignment of his
interest.  We have previously found that RIM produced sufficient evidence to
establish that the proposed repair was a required operation because the leases
underlying the 160-acre proration unit would otherwise expire.  This additional
evidence sufficiently established that Long was required to participate in that
operation or to assign his interest to the working interest owners who did
participate and that he refused to do so.  Issue 5(d) is overruled.

Long next complains in Issue 5(e) that there
was insufficient evidence that RIM gave notice of the work to be performed. 
RIM’s January 10, 2007 correspondence informed the working interest owners that
it intended to do the following:

·        
Perforate tubing @ 5460'.  Establish circulation & clean
annulus to surface.

·        
Chem-cut tubing above anchor catcher and @ 5465'.

·        
PU wash pipe, jars & overshot & jar tubing out of hole.

·        
RIH w/ wash pipe, jars & overshot & jar TAC out of hole
(may need to swedge casing).

·        
Run casing inspection log & set CIBP @ 9000'.

·        
Freepoint casing, cut & pull from hole as close to Top of
cement (8700') as possible.

·        
Replace bad casing & rerun w/ Bowen cementing casing patch.

·        
Cement casing into surface pipe.

·        
Drill out and test casing.

·        
Re-perforate producing interval & stimulate w/ acid.

·        
Rerun production equipment and return to production. 

 

RIM also advised
the working interest owners that this would cost an estimated $320,686, and it
provided a breakdown of these costs.  Finally, RIM told the working interest
owners that, if it encountered additional problems, operations would be
suspended and a revised plan submitted. 

Long
correctly notes that the plan of operation described in the correspondence did
not include a sidetrack operation or drilling a replacement well, but that both
were done.  We note that the letter did advise the working interest owners that
both were possible if the initial repair was unsuccessful.  RIM was not
required to provide Long with additional notice.  The summary judgment evidence
establishes that Long did not respond to RIM’s January correspondence.  There
is no contention that RIM did anything other than what was originally
contemplated.  That effort was unsuccessful, and RIM proceeded with additional
activities.  Because Long did not respond to the AFE, he no longer had an
interest in the Lindsey Well and was not entitled to additional notice.  Issue
5(e) is overruled.

In
Issues 5(f) and 11, Long complains of the award of attorney’s fees, contending
that there were disputed questions of fact on the reasonableness of that
award.  RIM’s counsel filed an affidavit dated December 17, 2008, and testified
that RIM had incurred fees to date of $16,931.50.  He filed a second affidavit
dated August 20, 2009.  In that affidavit, he testified that RIM had incurred
attorney’s fees of $41,380.  He also offered testimony as to reasonable and
necessary fees in the event of an appeal.  Long contends first that the difference
between the two affidavits creates a fact question.  However, because they
represent fees incurred as of two separate dates, they are not inconsistent and
no fact question was created.

Long
contends second that he raised a fact question.  Long responded with the
affidavit of his counsel.  Counsel testified that the requested fees were, in
his opinion, excessive and that even $15,000 would be excessive.  RIM contends
that Long’s affidavit was insufficient to create a fact question because it was
conclusory.  Long’s affidavit is short on detail but no less so than RIM’s
affidavit.  RIM’s affidavit established counsel’s expertise and experience in
this area of the law, his familiarity with reasonable and necessary fees, and
RIM’s incurrence of approximately $41,000 in fees so far.  Counsel did not,
however, offer any evidence describing the work performed.  In light of this,
Long’s counsel’s affidavit that $41,000 was excessive based upon his experience
is sufficient to create a fact question.

Issues
5(f) and 11 are sustained.  This case is remanded solely for a factual
determination of the reasonable and necessary fees to be awarded.

IX. 
Conclusion

The judgment of the trial court is affirmed in part and
reversed and remanded in part.  That portion of the judgment awarding
attorney’s fees is reversed, and this cause is remanded to the trial court for
a factual determination of that issue only.  The remainder of the judgment is
affirmed.

            

 

RICK STRANGE

                                                                                    JUSTICE

 

April 14, 2011

Panel consists of:  Wright, C.J.,

McCall, J., and Strange, J.









[1]Specifically, Section 109, Block M, E.L. & R.R. Ry.
Co. Survey, Dawson County, Texas.

 





[2]This tract was described as:

 

The south 188.182 acres of the East 3/8ths of said
Section 109, SAVE AND EXCEPT the 26.667 acre tract included in the pooled unit
surrounding the Patrick – Lindsey Trust 109 No. 1 Well as described in Pooling
Agreement and Declaration of Pooled Unit dated January 1, 1995, filed at Volume
371, Page 385 of the Oil and Gas Lease Records of Dawson County, Texas; and,
LESS the South 100 feet of said 188.182 acre tract.

 





[3]During a hearing on RIM’s motion for summary judgment,
Long acknowledged that he was subject to the JOA’s nonconsent penalty.





[4]Long argues that a similar situation existed in Long
Trusts v. Griffin, 222 S.W.3d 412 (Tex. 2006), and that the supreme court
held that an agreement to assign undefined interest within a larger defined
area was unenforceable.  The court, however, held that the agreement was
unenforceable because the larger area was insufficiently defined.  In that
case, the contract area was defined as being located “in the Northeast portion
of Rusk County, Texas, and consist[ed] of 50+ leases covering approximately
2100+ net mineral acres in the Dirgin and Oak Hill Fields area” as “described
in the attached Exhibit ‘A.’”  Exhibit A identified the lessor’s name, the
survey name, the term, and net acreage for each lease.  The court held that
this was insufficient to identify the exact location of the lease with
reasonable certainty.  Id. at 416.  But as we have previously noted, the
contract area description in the JOA was legally sufficient.





[5]This provision provides:

 

      2.  Rework or Plug Back:  Without the
consent of all consenting parties, no well shall be reworked or plugged back
except a well reworked or plugged back pursuant to the provisions of Article
VI.B.2. of this agreement.  Consent to the reworking or plugging back of a well
shall include all necessary expenditures in conducting such operations and
completing and equipping of said well, including necessary tankage and/or
surface facilities.





[6]The supreme court adopted the reasoning of the lower
court on this point.  That opinion is at Forderhause v. Cherokee Water Co.,
623 S.W.2d 435, 438-39 (Tex. Civ. App.—Texarkana 1981).





[7]See Westland,
637 S.W.2d at 908 (“a purchaser is bound by every recital, reference and
reservation contained in or fairly disclosed by any instrument which forms an
essential link in the chain of title under which he claims”).