**HORSE HOLLOW GENERATION TIE, LLC, Appellant**

**Whitworth–Kinsey #2, Ltd., Cross–Appellant**

v.

**WHITWORTH–KINSEY #2, LTD.; Whitworth–Kinsey #3, Ltd.; and David Olen Whitworth, Appellees**

**Horse Hollow Generation Tie, LLC, Cross–Appellee**

NO. 03–13–00599–CV

Court of Appeals of Texas, Austin.

Filed: April 14, 2016

Rehearing Overruled August 22, 2016

325

Matthew F. Wymer, Beirne, Maynard & Parsons, L.L.P., San Antonio, TX, for Appellees.

Jeffrey M. Tillotson, Tillotson Law, David S. Coale, Lynn, Tillotson, Pinker & Cox, L.L.P., Christopher Schwegmann, Dallas, TX, for Appellant.

Before Chief Justice Rose, Justices Field and Shannon *

## OPINION

Bob E. Shannon, Justice

Appellant, Horse Hollow Generation Tie, LLC (the Company) appeals from the judgment of the district court of Concho County rendered in a trial to the court. The pivotal appellate issue stems from the district court's refusal to reform three electric-transmission easements. Appellees are Whitworth–Kinsey # 3, Whitworth–Kinsey # 2, and David Whitworth. Whitworth–Kinsey # 2 is also cross-appellant.[1] We will affirm the judgment in part and reverse it in part.

In 2008 and 2009 the Company constructed a 200–mile electric-transmission line to connect its wind farms near Abilene with a substation close to San Antonio. Operating on an aggressive schedule, the Company completed the line in about fourteen to eighteen months.

The Company's landmen negotiated with about 270 landowners to create the 180–foot easement corridor along the 200–mile

* Before Bob E. Shannon, Chief Justice (retired), Third Court of Appeals, sitting by assignment. See Tex. Gov't Code § 74.003(b).

1. Whitworth–Kinsey # 3, Ltd. (W–K # 3) is a limited partnership; its general partner is the Cynthia Whitworth Quinn Trust and its trustee is Cynthia Whitworth Quinn. Cross-appellant Whitworth–Kinsey # 2, Ltd. (W–K # 2) is a limited partnership; its general partner is the David Whitworth Trust and its trustee is David Whitworth. David Whitworth and Cynthia Quinn are brother and sister.

transmission route. The Company followed industry standards in the manner of compensating landowners. Upon agreement of the price per linear foot, the landman would estimate the easement's length in linear feet. The landowners then would be paid one-half of the estimated length. The remaining sum would be paid, based upon the final surveyed footage, after the transmission line was completed. The surveyed line might be longer than the estimated footage or it might be shorter. The final payment, being based upon the surveyed footage, "trued-up" the estimate.

In the farm and ranch country of Concho and McCulloch Counties the transmission route passed over the Whitworth properties. The Company pleaded that before it and the Whitworth partners executed the respective transmission easements, they understood and agreed that the Company would compensate them for the actual surveyed length of the easements. The Company pleaded further that the easements, as written, did not properly reflect the parties' agreement. Instead, the Company asserted, the easements incorrectly stated that the Company would estimate the length of the easement and pay the landowners one-half of that estimate up front and then pay the remaining one-half of such estimate after the transmission line was completed.

The Company maintained that the landowners had agreed and understood that they would be compensated based upon the actual surveyed length of the easements, not on their estimated length and that the parties were mutually mistaken that the language of the easements was legally sufficient to describe that agreement. By way of relief, the Company moved the court to reform the easements to reflect the parties' agreement that payment should be based on surveyed actual length.

W–K # 3 and David Whitworth filed answers and counterclaims asserting, among other things, breach of contract by the Company in failing to compensate them based on the estimated length of the easements as set out in the easement agreements.

Upon trial, the district court denied the Company's plea for reformation. The court concluded, instead, that the Company failed to prove that the written transmission easements did not reflect the true agreement of the parties because of a mutual mistake. The court rendered judgment that Whitworth–Kinsey # 3 and David Whitworth, individually, recover against the Company $528,000 and $18,240, respectively.

### The Company's appeal

The Company contends on appeal that it conclusively established facts entitling it to reformation of the easements. *See City of Keller v. Wilson*, 168 S.W.3d 802, 814–15 (Tex.2005) (citing Robert W. Calvert, *"No Evidence" & "Insufficient Evidence" Points of Error*, 38 Tex. L.Rev. 361–64 (1960)).

The objective of reformation is the correction of a mutual mistake made in preparing a written instrument so that the instrument reflects the original agreement of the parties. *Cherokee Water Co. v. Forderhause*, 741 S.W.2d 377, 379 (Tex. 1987) (citing *Brinker v. Wobaco Trust Ltd.*, 610 S.W.2d 160, 163 (Tex.Civ.App.—Texarkana 1980, writ ref'd n.r.e.)). Reformation requires two elements: (1) an original agreement and (2) a mutual mistake made after the original agreement in reducing the original agreement to writing. *Cherokee Water Co.*, 741 S.W.2d at 379. A mutual mistake is one common to both or all parties, wherein each labors under the same misconception respecting a material fact, the terms of the agreement, or the

provisions of a written instrument designed to embody such an agreement. *Allen v. Berrey*, 645 S.W.2d 550, 553 (Tex. App.—San Antonio 1982, writ ref'd n.r.e.) (citing *Capitol Rod & Gun Club v. Lower Colo. River Auth.*, 622 S.W.2d 887, 892 (Tex.App.—Austin 1981, writ ref'd n.r.e.). The fact that an error was caused by a scrivener's or draftsman's failure to embody the true agreement of the parties in a written instrument is a proper ground for reformation on the basis of mutual mistake. *Gail v. Berry*, 343 S.W.3d 520, 524 (Tex.App.—Eastland 2011, pet. denied) (holding that existence of mineral reservation in sales contract and affidavit testimony that lack of same reservation in deed was result of "inadvertent failure to copy the reservation from the sales contract" was mutual mistake subject to reformation (citing *Cornish v. Yarbrough*, 558 S.W.2d 28, 32 (Tex.Civ.App.—Waco 1977, no writ)); *Hatch v. Williams*, 110 S.W.3d 516, 522 (Tex.App.—Waco 2003, no pet.) (affirming trial court's reformation of deed based on mutual mistake where evidence showed attorney who handled transaction erroneously attached wrong property description).

The signed easements of the Whitworth properties were worded in such a way as to provide for a first payment based on the initial estimate, and the second payment also based upon the same estimate, instead of the final, surveyed length. Matt Gesin, the Company representative, testified that the statement in the easement that the second payment would be based upon the same estimate was a mistake. In all the years that he had worked as a landman, he explained, he had never seen the second easement payment based on anything other then the final surveyed footage.

The original agreement and its relevant terms were conclusively established by the testimony and actions of David Whitworth. Although Ms. Quinn undoubtedly retained the right to sign the easement contract for W–K # 3, she never denied that her brother, David Whitworth, had the authority to negotiate for W–K # 3. In fact, Whitworth negotiated both the price and terms of compensation on behalf of himself, W–K # 2, and W–K # 3 to reach easement agreements between each of them and the Company. He rejected as "insignificant" or "ridiculously low" the Company's initial offers of payment per linear foot. He did some checking around to learn what might be a fair price. In time, he agreed upon the sum of $100 per linear foot. He also proposed changes in the wording of the easements which were accepted by the Company.

In the beginning, Whitworth energetically pursued the premise that final payments would be based on actual surveyed footage. He enlisted the assistance of Paul Bierschwale, a former college classmate, to meet with Company representatives to discuss several matters concerning the transmission easements. One of the issues discussed was the point that final payments should be based on surveyed footage. The Company agreed, and its Land Services Supervisor, Joshua Dean, wrote Whitworth stating, "We agree [that final compensation is based upon actual surveyed footage] and while we think that this is the intent of the agreements, we are willing to amend to make it clear."

After successfully securing payment to W–K # 2 based upon actual surveyed footage, Whitworth later executed an abrupt *volte-face*, insisting that in the case of W–K # 3 and his own individual property, final payment should be based not upon actual surveyed footage, but rather upon estimated footage as set out in the ease-

ment contracts.[2]

Portions of Whitworth's oral deposition were read into evidence. In that testimony Whitworth admitted that he understood before he signed the easement agreement that the parties intended to pay 50 percent of the estimated footage up front and that the remaining payment would be based on final surveyed footage. Whitworth further admitted in the deposition testimony that he understood that everyone agreed that payment should be based on final surveyed footage. After acknowledging his deposition testimony Whitworth added, "The contract didn't say that, though." Whitworth's counsel then asked him:

Q. David, regardless of what you understood, the contract that you signed provides for payment of one-half of the estimated distance up front at a hundred dollars a foot, and one-half of the estimated distance at the end at a hundred dollars a foot?

A. Yes.

Q. Are you asking the Court to enforce the contract?

A. Yes.

Despite his admitted understanding of the original agreement, Whitworth continued to insist on compensation based on the terms of the easement contract as written. Because he did not explain or modify his admissions, they stand uncontradicted and are controlling as to his knowledge of the existence and terms of the original contract. *See Griffin v. Superior Ins. Co.,* 161 Tex. 195, 338 S.W.2d 415, 418, 419 (1960); *Stafford v. Wilkinson,* 157 Tex. 483, 304 S.W.2d 364, 366 (1957); *see also Mendoza v. Fidelity & Guar. Ins. Underwriters, Inc.,* 606 S.W.2d 692, 694 (Tex.

1980) (referring to *Griffin,* 338 S.W.2d at 419, for circumstances under which party's testimonial declarations are considered judicial admissions); *City of Austin v. Miller,* 767 S.W.2d 284, 288 (Tex.App.—Austin 1989, writ denied) (relying, in part, on fact that party never retracted, contradicted, or explained deposition testimony after ample opportunity to do so, to hold that testimony was judicial admission).

Whitworth was W–K # 3's agent for negotiations with the Company. As such, his understanding of the original agreement, that payment should be based upon final surveyed footage, was imputed to W–K # 3 as a matter of law. *See Preston Farm & Ranch Supply, Inc. v. Bio–Zyme Enters.,* 625 S.W.2d 295, 300 (Tex.1981) (holding that defendant in suit on sworn account, by authorizing bookkeeper to deal with his statements and payments, had imputed knowledge sufficient to form contract (citing *Victory v. State,* 138 Tex. 285, 158 S.W.2d 760, 764 (1942) (holding that taxpayer had imputed knowledge of valuation board's notice because her agent appeared before board)).

The record demonstrates that at the time the easement contracts were signed, both Whitworth and the Company were under the impression that the contracts followed the terms of their original agreement. For example, Whitworth immediately pursued compensation for W–K # 2 based upon actual surveyed footage as provided in the original agreement. Likewise, the Company was of the same view, as reflected in Joshua Dean's letter: "We agree [that final compensation is based upon actual surveyed footage] and while we think that is the intent of the agree-

---

2. The estimated footage of the easement over W–K # 3 was 10,560 feet while the actual surveyed footage was 4,212.93 feet. The estimated footage of the easement over David Whitworth's individual property was 5,614 feet whereas the actual surveyed footage was 5,358.82 feet.

ment, we are willing to amend to make it clear." In furtherance of that view, the Company compensated W–K # 2 predicated upon actual surveyed footage. Both parties, of course, were wrong in their assumption, and thus both parties labored under the same misconception. *See Allen,* 645 S.W.2d at 553. Moreover, the failure of the transmission-easement contracts to follow the relevant terms of the original agreement was plainly the result of a draftsman's error.

Because both parties were under the mistaken belief that the easement contracts reflected the original agreement, we conclude that this was a mutual mistake by the parties. The transmission easements will be reformed to reflect the parties' original agreement that final compensation be based upon the actual surveyed footage. *See Cherokee,* 741 S.W.2d at 379 (noting reformation appropriate to correct mutual mistake).

**W–K # 2's cross appeal**

W–K # 2, as cross-appellant, raises two issues. The first concerns that part of the judgment requiring it to pay the Company $33,470, which the district court characterized as an "overpayment." W–K # 2 insists that no pleading supports such award. We will reverse this part of the judgment, but not upon the basis urged by W–K # 2.

As previously discussed, the district court refused to reform the transmission easements and concluded that the easements required final compensation based upon the estimated length of the transmission line. The Company had previously paid W–K # 2 $1,616,270 based upon the actual surveyed footage of the transmission line. The district court found that the estimated length of the line across W–K # 2 was 15,828 feet or $1,582,800 when multiplied by $100 per foot. Holding true to its course, the district court concluded that the Company had overpaid W–K # 2

some $33,470. Because this Court will order the reformation of the transmission easement to provide final compensation based upon actual surveyed footage, we will reverse this part of the judgment and render judgment that the Company take nothing from W–K # 2.

In its second issue cross-appellant W–K # 2 complains of the district court's judgment construing the transmission easement to permit the Company's use of two steel poles in its transmission line. Joshua Dean testified by affidavit that the Company installed two steel poles on W–K # 2's land because of scheduling requirements and the availability of materials to complete the construction. Dean also explained in his letter to David Whitworth that the use of steel poles results in "significant reductions in impact" to the land. Whitworth, on deposition, confirmed that the installation of the steel, instead of wood or concrete poles, had not changed his use of the land.

W–K # 2 contends that the terms of the transmission easement did not permit the use of steel poles because the easement "specifically states that the poles shall be of concrete or wood."

Section 1 of the easement defines the scope of the easement and also defines the phrase "Transmission Facilities." Section 1 of the Transmission Easement provides in part as follows:

> ***Transmission Easement.*** Grantor grants to Grantee an irrevocable, exclusive easement for the construction, installation, maintenance, use, operation, repair; replacement relocation and removal of an electric transmission line and a telecommunication line for the operation of the electric transmission line (collectively "Transmission Facilities") on, over, across, along and under the Land or such portions thereof that

may be described in the attached Exhibit A and depicted in the attached Exhibit B ("Transmission Easement").

Section 1 defines "Transmission Facilities" as:

"Transmission Facilities" shall mean all improvements whose purpose is to deliver electrical power to an electrical power grid or other system, including without limitation transformers and overhead electrical transmission lines and interconnection facilities for a 345 KV line of wood or concrete poles, provided however, Grantee shall not have the right to construct an electrical substation on the Land.

We accept the Company's argument that the plain, ordinary, and generally accepted meaning of the phrase "all improvements whose purpose is to deliver electrical power to an electrical power grid or other system" encompasses steel poles as well as poles made of wood or concrete. *See, e.g,* *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex.2005) ("Contract terms are given their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense."). Indisputably, the Company installed the two steel poles to "deliver electrical power to an electrical power grid." Accordingly the two steel poles are an "improvement" within the meaning of Section 1. Contrary to W–K # 2's argument, the Company is not limited to wood or concrete poles; instead, the phrase "wood or concrete poles" is used as an example of permissible improvements falling within the scope of the easement.

We will affirm that part of the judgment construing the transmission easement to allow the use of steel poles; we will here render judgment reforming the compensation agreements of the involved transmission easements to provide for final compensation based upon actual surveyed footage. Accordingly, we will reverse that part of the judgment awarding the Company $33,470 against W–K # 2 and here render judgment that the Company take nothing from W–K # 2; we will reverse that part of the judgment for W–K # 3 and David Whitworth, individually against the Company and remand those causes to the district court for entry of judgment for the Company based on the compensation agreements in the transmission easements as reformed by this Court.